IGNACIA S. MORENO
Assistant Attorney General
TERRY M. PETRIE, Attorney
STEPHEN R. TERRELL, Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO  80202
Telephone:     (303) 844-1369
Facsimile:     (303) 844-1350
Terry.Petrie@usdoj.gov
Stephen.Terrell@usdoj.gov

DANIEL G. BOGDEN
United States Attorney
NADIA AHMED
Special Assistant United States Attorney
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV  89101
Telephone:     (702) 388-6336
Facsimile:     (702) 388-6698

ATTORNEYS FOR THE UNITED STATES

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

---

UNITED STATES OF AMERICA,

     Plaintiff,

       v.

CLIVEN BUNDY,

     Defendant.

No. 2:98-cv-531-LRH

**DECLARATION OF
MARY JO RUGWELL**

---

## DECLARATION OF MARY JO RUGWELL

I, Mary Jo Rugwell, do declare as follows:

I have personal knowledge of the matters set forth in this declaration.

1

1.  I am currently the Associate State Director for the Bureau of Land Management Wyoming State Office and have been in this position since August 26, 2012. Prior to that, I served as the District Manager for the Bureau of Land Management (BLM), Southern Nevada District Office (SNDO) in Las Vegas, Nevada from April 13, 2008 through August 25, 2012. The BLM SNDO encompasses three Field Offices: the Las Vegas Field Office, the Red Rock/ Sloan Field Office, and the Pahrump Field Office.

2.  As District Manager for the SNDO, I was responsible for management of over three million acres of public lands, including the public lands within the former Bunkerville Allotment. I also oversaw a staff of approximately 150 BLM employees, including managers, supervisors, and resource experts.

*Resource Values within the Bunkerville Allotment*

3.  Lands managed by the SNDO in the Gold Butte area in southeastern Nevada encompass public lands between Grand Canyon-Parashant National Monument in Arizona, the Overton Arm of Lake Mead National Recreation Area and west to the Valley of Fire State Park. See Attachment A: Map & legend identifying federal lands managed by the "Bureau of Land Management." The area consists of rugged mountains, tilted sandstone ridges, and braided washes that turn into slot canyons. The former Bunkerville Allotment is located within the Gold Butte area, as shown in Attachment A.

   A.  Areas of Critical Environmental Concern (ACEC):

       (1)  There are several Areas of Critical Environmental Concern (ACEC) within the former Bunkerville Allotment. See Attachment B: Map of Public Land Special Management Units in Gold Butte Area. These ACECs are special management areas designated by the BLM to protect and prevent irreparable damage to significant historic, cultural, and fish and wildlife resources.

       (2)  Among the ACECs within the former Bunkerville Allotment is the Virgin River ACEC, which is located in northeast Clark County just south of the City of Mesquite. The Virgin River flows within the tri-state area of Utah, Arizona, and Nevada and the ACEC designation protects the river's wild and scenic character and riparian habitat. The ACEC contains portions of designated critical habitat for two fish species listed as endangered species under the Endangered Species Act (ESA): the Virgin River chub and the woundfin, as well as for one endangered bird species: the southwestern willow flycatcher (SWFL). The ACEC also supports habitat for the Yuma clapper rail, listed as endangered under the ESA and for the yellow-billed cuckoo, a candidate for listing under the ESA. Riparian habitat is extremely limited in this eco-region, making this habitat very important to maintain species diversity and to support bird migration.

       (3)  The former Bunkerville Allotment also includes designated critical habitat for desert tortoise, a species listed as threatened under the Endangered Species Act. 52 Fed. Reg. 5820 (Feb. 8, 1994) (available at http://ecos.fws.gov/docs/federal_register/fr2519.pdf). Consistent with the Desert

2

Tortoise Recovery Plan (USFWS 1994, 2011) and the Las Vegas Resource Management Plan (1998), most of the public lands within the Gold Butte area have been closed to all livestock grazing since 1998 to allow for recovery of desert tortoise habitat, an action that was made possible by Clark County's purchase and retirement of grazing privileges on BLM grazing allotments in this area. The County obtained funding to purchase and retire these grazing privileges as part of their obligations to minimize and mitigate impacts to desert tortoise in connection with the Clark County Multiple Species Habitat Conservation Plan, for which the USFWS issued Clark County an Incidental Take Permit under Section 10 of the Endangered Species Act, for development activities on other County lands within desert tortoise habitat (available at http://www.clarkcountynv.gov/Depts/dcp/Documents/Library/current%20HCP/cc-appa.pdf ).

B.      Archeological Resources: Archeological resources located within the former Bunkerville Area include rock shelters with blackened roofs, charcoal remnants, broken pottery, rock tools, and world-renowned petroglyphs.

C.      Designated Wilderness Study Areas: The former Bunkerville Allotment includes a portion of the Virgin Mountains Instant Study Area, which is managed consistent with guidelines for Wilderness Study Areas.

D.      Rare Plant Species and Soil:

        (1)      The public lands in the former Bunkerville Allotment include many sensitive and rare plant species that are directly and indirectly impacted by cattle grazing, such as: *Eriogonum viscidulum* (sticky buckwheat), *Arctomecon californica* (Las Vegas bearpoppy), *Anulocaulis leiosolenus* var. *leisolenus* (sticky ringstem), *Astragalus geyeri* var. *triquestrus* (threecorner milkvetch), *Astragalus mokiacensis* var. Gold Butte (Mokiak milkvetch), *Circium virginensis* (Virgin River thistle), *Enceliopsis argophylla* (silverleaf sunray), *Eriogonum corymbosum* var. *nilesii* (Las Vegas buckwheat), and *Pediomelum castoreum* (Beaver Dam breadroot).

        (2)      The public lands in the Gold Butte area also contain several plant communities, assemblages, and soil types that are extremely rare in the Mojave Desert and are directly and indirectly affected by cattle grazing, such as: biological soil crusts, alkali meadows and aquatic herb communities, desert oasis woodlands, and gypsum barren scrub.

*Impact of Cattle Grazing*

4.      Cattle grazing within desert landscapes can impact the ecological health of the land. Cattle tend to congregate around water sources and shady areas during hot periods, causing damage to streams, springs, seeps, and wet meadows that provide riparian habitats critical for the survival and reproduction of many native wildlife and plant species. See e.g., U.S. Department of the Interior. 2006. Technical Reference 1737-20:

Grazing Management Processes and Strategies for Riparian-Wetland Areas (available at: http://www.blm.gov/nstc/library/techref.htm).

5.      Cattle grazing can result in direct mortality to desert tortoise if cattle step on and crush tortoise burrows or indirectly by degrading range resources that are desert tortoise habitat.  See e.g., Region 8, Pacific Southwest Region, US Fish & Wildlife Service. May 2011. Revised Recovery Plan for the Mojave Population of the Desert Tortoise at pp. 136-137 (available at: http://www.fws.gov/nevada/desert_tortoise/dt_recovery_plan.html).

6.      Cattle also feed preferentially on many native grasses and forbs, which can reduce or eliminate these native plants that are vital habitats and food sources for wildlife species, including federally listed species. Cattle can also cause or contribute to the destruction and loss of biological soil crusts, and to the disturbance, compaction, and erosion of soils. Overgrazing by cattle can lead to the depletion of grasses and forbs and erosion that promotes the invasion of alien or exotic plant species such as cheatgrass and noxious weeds.  The spread of these invasive species contributes to ecological degradation and a loss of habitat for wildlife and other species that depend on healthy native vegetative communities.  See e.g., Belsky, A.J. and Gelbard, J.L. April 2000. Livestock Grazing and Weed Invasions in the Arid West (available at: http://www.santafetrailranch.com/articles/BelskyGelbardWeedReport.pdf).

7.      Detrimental impacts associated with livestock grazing can be particularly pronounced around water troughs, spring developments, supplemental feeding areas, and other areas where livestock congregate. Cattle impacts at water sources include degraded water quality, which adversely impacts aquatic species. See e.g., Brooks, M. et al. 2006. "Effects of Livestock Watering Sites on Alien and Native Vegetation in the Mojave Desert" in the *Journal of Arid Environments* (available at: http://citeseerx.ist.psu.edu/viewdoc/summary?doi=10.1.1.62.2612).

8.      Cattle can also damage or destroy archeological resources, such as by trampling on archeological sites and resources (which are often located in proximity to water sources) or by rubbing against petroglyphs--which can cause spalling (i.e., the petroglyph breaking off the rock).  These types of impacts were documented and reported to me by my staff archeologist within the areas where Mr. Bundy's unauthorized cattle grazing has been been observed, including on public lands within the former Bunkerville Allotment.

*Trespass Grazing on Public Lands*

9.      Upon becoming District Manager for the SNDO in 2008, one of the first issues that I received a briefing on was the grazing trespass situation in the northeastern portion of the Southern Nevada District.  According to SNDO records, cattle owned by Cliven Bundy were being observed and had been documented grazing without authorization on the public lands.

4

10.     Cliven Bundy grazed the federal lands within the former Bunkerville Allotment (approximately 154,000 acres), which is located in the northeast corner of Clark County Nevada adjacent to the lands at issue in this litigation, under a grazing permit for about 20 years. However in 1993, he refused to sign an offered permit and started grazing livestock on federal lands in the former Bunkerville Allotment without any authorization to do so and without paying grazing fees. This led the BLM to cancel Bundy's grazing permit on February 17, 1994, and to initiate a lawsuit (United States v. Cliven Bundy, Case No. CV-S-98-531-JBR (RJJ) or "Bundy I") that resulted in the Federal District Court for the District of Nevada issuing a Permanent Injunction on November 4, 1998 enjoining Cliven Bundy's grazing on public lands in the Bunkerville Allotment. See Attachment C. The Permanent Injunction Order was affirmed by the Ninth Circuit on May 10, 1999. See Attachment D. In addition to Cliven Bundy being permanently enjoined from grazing the Bunkerville Allotment, the entire allotment has been closed to all livestock grazing since 1998 to protect critical desert tortoise habitat.

11.     The public lands surrounding the former Bunkerville Allotment, with the exception of two small allotments where a limited amount of grazing is authorized,[1] have also been closed to all livestock grazing since 1998 and the 1998 Las Vegas Resource Management Plan (RMP) Record of Decision (ROD) designated the Bunkerville Allotment and surrounding public lands as closed to grazing. Cliven Bundy has held no authorization to graze any public lands outside the Bunkerville Allotment and does not currently hold an authorization to graze any public lands in the Gold Butte area.

12.     In April 2008, the BLM also cancelled Mr. Bundy's range improvement authorizations for the former Bunkerville Allotment and that decision was upheld on appeal by the Interior Board of Land Appeals. See Attachments E and F. Mr. Bundy has not complied with that decision and trespass investigations discussed below indicate that he continues to use those improvements.

13.     The directive to employees prior to my becoming the District Manager was to avoid any situations that might result in a confrontation with Cliven Bundy, as a result of notices he had sent to the BLM in the late 1990s which appeared to suggest a willingness to engage in potentially violent action in response to any efforts to resolve the trespass grazing. See e.g., Attachment G. As a result, the BLM employees occasionally documented trespass cattle if they came across trespass cattle or evidence of unauthorized grazing in the course of their duties, but were not sent out to specifically document such trespass grazing.

---

[1] The Lower Mormon Mesa Allotment is the only allotment where there is currently any authorized cattle grazing, with one permittee authorized to graze cattle during a portion of the year within that allotment. That permittee has grazed a small number of livestock (a maximum of 40 cattle) consistent with the terms of his grazing permit and his cattle have not been found outside the allotment. There is also one other extremely small allotment of approximately 5000 acres of public land – the Flat Top Mesa Allotment – north of Highway I-15, on which another permittee is authorized to graze the equivalent of about five cows worth of forage. However, no cattle have been grazed on that allotment for at least the past several years and only a handful of domestic horses are currently authorized to graze those public lands. Mr. Bundy has never been authorized to graze any livestock in either the Lower Mormon Mesa or Flat Top Mesa Allotments.

14.  During my tenure as District Manager for the SNDO, I made efforts to reach out to Cliven Bundy and to any others (such as County officials) who might be willing or able to find a way to resolve Cliven Bundy's trespass grazing. However, those efforts were unsuccessful and Cliven Bundy rebuffed or ignored any efforts I made to speak to or meet with him. For example, County Commissioner Tom Collins, a personal friend of Mr. Bundy's, offered to broker a meeting with Cliven Bundy that I agreed to attend. But on the day of the meeting, the Commissioner's staff called to cancel the meeting, providing no reason for the cancellation. That meeting was never rescheduled by the County Commissioner. As another example, I attended a Nevada Wildlife Commission meeting in the fall of 2011 to make a presentation on the Gold Butte Road Designation. Mr. Bundy had also been invited to speak. I heard Mr. Bundy's presentation, during which he stated that he had "fired the BLM," and confirmed that his cattle had been continuously grazing in the Gold Butte area without a permit and that he had numerous range improvements in the area. Attachment H is a summary of those remarks from the official minutes of the meeting. After the Wildlife Commission meeting, I attempted to speak with Mr. Bundy. I stood by for several minutes while he spoke to one of the Commissioners. However, he made no effort to even acknowledge my presence. I therefore left my card with his wife and asked her to have him call me so that we could sit down and discuss the trespass. I never heard from Mr. Bundy and further attempts to speak with him were no more successful.

15.  Because of the sporadic and intermittent nature of the BLM's documentation of Cliven Bundy's trespass grazing on public lands during the years before my tenure as District Manager and my desire to develop a clear record that would allow BLM to take appropriate actions to resolve this trespass grazing, I worked with my staff to obtain funding in 2009 from the Section 7 Endangered Species Act desert tortoise account to initiate work on resolving the trespass grazing. We received Section 7 funding in subsequent years as well.

16.  The BLM's Section 7 account consists of funds obtained as mitigation money through development projects in desert tortoise habitat that are used in consultation with U.S. Fish and Wildlife Service for projects that will benefit critical habitat and populations of desert tortoise. We hired a contractor to assist us in getting a handle on the trespass grazing and assigned it as a priority to the Las Vegas Field Office, which was one of three Field Offices under my jurisdiction. That office identified a project manager starting in late 2010. The District Chief of Law Enforcement for the SNDO took the lead to work with the Project Manager on a law enforcement plan in the event that we needed to move forward with an impoundment action.

17.  Since there had been little recent correspondence with Mr. Bundy, the SNDO Associate District Manager sent a letter to him dated January 21, 2011, reminding him that his cattle remained in trespass and that BLM would proceed to resolve the issue. See Attachment I. The letter quoted a recent article in the December 10, 2010 *Las Vegas CityLife* paper where he admitted he was in trespass. See Attachment J.

6

18.   In order to better document the actual extent of the trespass grazing in the Gold Butte Area, and to determine whether the trespass livestock on public lands were owned by Cliven Bundy or by other ranchers, I authorized preparations and funding for a comprehensive cattle count involving both aerial and ground team components.

19.   At my direction, my staff conducted a cattle count on public lands from March 21-25, 2011 using a helicopter and ground crews to determine locations, numbers and brands of trespass livestock. The trespass count found over 900 livestock within the Gold Butte area, of which 352 were found in the former Bunkerville Allotment. Although many of those livestock had no brands or ear marks, 122 head had brands or earmarks that clearly identified them as belonging to Cliven Bundy. No cattle were observed in the former Bunkerville Allotment with brands or ear marks registered to anyone other than Cliven Bundy. See Exhibit 7: Declaration of Lauren Brown at ¶¶ 8 and 10. This trespass investigation therefore confirmed that Mr. Bundy is the only person known to have cattle in the former Bunkerville Allotment.

20.   After the trespass investigation, the BLM issued Cliven Bundy a Notice of Trespass and Order to Cease and Desist on June 8, 2011. See Attachment K. In response, Mr. Bundy sent us a "constructive notice" letter. See Attachment L.

21.   On July 26, 2011, the BLM issued Bundy a Notice of Intent to Impound, see Attachment M, which was also posted in the Mesquite and Bunkerville Post Offices on July 29, 2011, and published for five days in the Las Vegas Review-Journal and/or Las Vegas Sun. It was also published in the Desert Valley Times online and in the Mesquite Local NEWS. See Attachment N.

22.   A follow-up aerial and ground inspection on August 15-19, 2011 confirmed that 477 livestock, including those with Bundy's brand and/or earmarks, remained in the former Bunkerville Allotment and that Mr. Bundy had not removed the trespass livestock. See Exhibit 7: Declaration of Lauren Brown at ¶¶ 13and 14. Therefore, on September 20, 2011, the BLM issued another Order to Remove the trespassing livestock, along with a Trespass Decision and Demand for Payment for trespass livestock on the public lands that had been documented between May 29, 2008 and March 5, 2011 and between March 21 and August 19, 2011. See Attachment O. Bundy did not appeal the September 20, 2011 decision.

23.   All of the Notices and Decisions described above were sent to Bundy by certified mail. The certified mail receipt cards were signed by Bundy or members of his family.

24.   In the years that I served as District Manager, it was my desire to try to find a means to engage in a conversation with Mr. Bundy to resolve the trespass through Mr. Bundy voluntarily removing his livestock from the public lands. Unfortunately, I was unable to engage Mr. Bundy in any type of dialogue whatsoever due to his unwillingness to communicate with me.

7

25.  As my attempts to give Mr. Bundy repeated opportunities to remove his livestock from public lands were not successful, and given that Mr. Bundy had also failed to comply with a permanent injunction obtained through judicial litigation in the late 1990s (nor did he pay damages for his trespass grazing as directed by the Court), I directed my staff to begin preparations for a livestock impoundment pursuant to BLM's regulations at 43 C.F.R. § 4150.4.

26.  My staff conducted another follow-up aerial survey from February 1-3, 2012, that found approximately 650 cattle grazing in trespass on federal lands managed by BLM and NPS, including within the former Bunkerville Allotment.  Another aerial survey was conducted on March 28 and 30, 2012 in order to locate cattle for a planned gather operation. Approximately 740 cattle were found during this flight, including over 100 calves, both within and outside of the former Bunkerville Allotment.

27.  Mr. Bundy has never had any authorization to construct, maintain or use any range improvements on public lands outside the former Bunkerville Allotment, and no longer is authorized to use range improvements within the former Bunkerville Allotment. However, during the aerial surveys, my staff documented many unauthorized range improvements both within and outside of the former Bunkerville Allotment that are being actively used to manage the trespass cattle on the public lands. On April 9, 2012, the BLM issued a Trespass Decision and Order to Remove unauthorized range improvements to Mr. Bundy via certified mail. This order applied to all range improvements being used outside the former Bunkerville Allotment that were not already covered under the 2008 Range Improvement Cancellation.  See Attachment P.

28.  Prior to beginning the actual impoundment operation, we worked through the Clark County Sheriff to make an offer to Mr. Bundy.  The offer involved the BLM gathering all of the cattle currently grazing in trespass on federal lands, shipping them to the facility of his choice, and giving Mr. Bundy the proceeds from the sale of his livestock in exchange for achieving the goal of safely removing the cattle from the public lands and resolving the trespass.  Mr. Bundy refused the BLM's offer to assist him in gathering and transporting his livestock so they could be removed from the federal lands.

29.  At the request of the Clark County Sheriff, the BLM agreed to give the sheriff another opportunity to contact Mr. Bundy to determine if we could reach a mutually acceptable resolution that resulted in the removal of the trespass livestock from the federal lands and allowed Mr. Bundy to take possession of his livestock.

30.  To allow the sheriff time to communicate with Mr. Bundy, the BLM delayed the start of the cattle trespass impoundment operation from April 7 to April 12, 2012.  We had determined that it was important to gather and remove the trespass cattle that were widely distributed and that posed a potential threat to public safety and to natural resources on the federal lands.  We had also notified Mr. Bundy that he would be given the opportunity to come claim his cattle (see Attachment Q), because the Nevada Department of Agriculture had notified BLM that it would not be able to issue brand clearance

8

certificates due to state law.  See Exhibit 12: Declaration of Amy Lueders at ¶¶ 5-10 (discussing NRS § 565.125).

31.     On April 9, 2012, I was contacted by Sue Catoor, the Contractor for the gather, who had received a hand-delivered letter and Constructive Notice from Mr. Cliven Bundy.  See Attachment R.  The letter threatened legal action against the Contractor and specifically stated "that there is a volatile situation currently taking place" as well as a reference to a "range war."

32.     Following Mr. Bundy's communications with the Contractor, on Tuesday morning, April 10, 2012, I received an email from Michael J. Pool, Deputy Director for Operations of the BLM, directing us to decommission the Bundy impound operations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Signed this 4th day of March, 2013 in Cheyenne, Wyoming.


Mary Jo Rugwell

9

# ATTACHMENT A



Bundy Cattle
Trespass Area
Overview

Legend

Former Bunkerville Grazing Allotment
New Trespass Land
City Location
NHD Hydrology

Major Road
Interstate
US Highway
State Highway
County Highway
Arterial
Collector
Local
Back Country Byway
Resource
Restricted

Land Status
Bureau of Indian Affairs
Bureau of Land Management
Bureau of Reclamation
City of Las Vegas
Clark County, NV
Department of Defense
Department of Energy
Fish and Wildlife Service
Forest Service
National Park Service
Nevada State
Private
Lake Mead

Prepared for
United States of America
v. Bundy
No. 98-cv-531
Not intended for any other use

0    2.5    5         10 Miles

NATIONAL
SYSTEM OF
PUBLIC LANDS

Ex. 2 - Rugwell Dec. Att. A - Page 1 of 1

# ATTACHMENT B



# Bundy Cattle Trespass Overview

**Legend**

- Former Bunkerville Grazing Allotment
- New Trespass Land
- City Location
- NHD Hydrology

**Major Road**

- Interstate
- US Highway
- State Highway
- County Highway
- Arterial
- Collector
- Local
- Back Country Byway
- Resource
- Restricted
- Biological
- Cultural
- Cultural/Biological
- Desert Tortoise

**Land Status**

- Bureau of Indian Affairs
- Bureau of Land Management
- Bureau of Reclamation
- City of Las Vegas
- Clark County, NV
- Department of Defense
- Department of Energy
- Fish and Wildlife Service
- Forest Service
- National Park Service
- Nevada State
- Private
- Lake Mead
- National Park Wilderness
- BLM Wilderness Study Area
- BLM Wilderness

Prepared for
United States of America
v. Bundy
No. 12-cv-804
Not intended for any other use

0 2.5 5 10 Miles

U.S. DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT
NATIONAL SYSTEM OF PUBLIC LANDS

# ATTACHMENT C

*FYI*
*SWM*

1993V00532
BTW

**AO 450 (Rev. 5/85)  Judgment in a Civil Case ⊕**

# UNITED STATES DISTRICT COURT

***** _____DISTRICT OF___NEVADA_____

UNITED STATES OF AMERICA,

                                    JUDGMENT IN A CIVIL CASE

        Plaintiff,

        V.

CLIVEN BUNDY,                        CV-S-98-531-JBR(RJJ)


        _____Defendant._____/


__ **Jury Verdict.** This action came before the jury for a trial by the Court.  The issues have been tried and the jury has rendered it's verdict.

_X_ **Decision by Court.** This action came to trial before the Court. The issues have been tried and a decision has been rendered.


    IT IS ORDERED AND ADJUDGED that Permanent Injunction is entered in favor of Plaintiff and against Defendant.


November 4, 1998
    Date

LANCE S. WILSON
    Clerk

(By) Deputy Clerk,

ENTERED
SERVED
NOV 4 1998
CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY_____ DEPUTY

FILED
NOV 4 1998
CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY_____ DEPUTY

20

Ex. 2 - Rugwell Dec. Att. C - Page 1 of 12



1993V00532
BTW USAO

U.S. ATTORNEYS
RECEIVED
Nov 4 4 36 PH '98
LAS VEGAS, NV

RECEIVED
Nov 3 4 30 PH '98
LANCE S. WILSON
BY _____

ENTERED AND SERVED
NOV 4 1998
CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY_____ DEPUTY

1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

7

8    UNITED STATES OF AMERICA,                    CV-S-98-531-JBR (RJJ)

9          Plaintiff,

10   v.

11   CLIVEN BUNDY,                                   <u>ORDER</u>

12         Defendant.

13

14         This matter comes before the Court on Defendant Cliven Bundy's ("Bundy") Motion to

15   Dismiss (#4), Plaintiff's Motion for Summary Judgment (#11), and on Bundy's Motion to Strike

16   Motion for Summary Judgment (#14).  Oppositions and Replies were filed for all motions.

17                                      **I. BACKGROUND**

18         The United States filed a Complaint (#1) on March 27, 1998 for injunctive relief to prevent

19   Bundy's alleged unauthorized and unlawful grazing of livestock on property owned by the United

20   States and administered by the Secretary of the Interior, Bureau of Land Management ("BLM"),

21   and for trespass damages.

22         Beginning about 1954, Bundy or his father or both have grazed livestock on public lands

23   owned by the United States and administered by the BLM.  For several years, Bundy or his father

24   applied to the BLM to use the Bunkerville Allotment ("Allotment") for livestock grazing and paid

25   the BLM for the use of the Allotment.  Beginning in March 1993, Bundy refused to pay the

26   grazing bills or apply for use of the Allotment.

19

00000670

1    From 1973 or before until 1993, the BLM issued to Bundy's father and Bundy, as his
2    father's representative, ephemeral grazing permits to graze livestock on the Allotment.  Regions
3    classed as ephemeral do not consistently produce forage, but periodically provide annual
4    vegetation suitable for livestock grazing. 33 FED. REG. 18245.  Before grazing on an ephemeral
5    range, a person must submit an application to the BLM.  The BLM will determine if adequate
6    forage is available and that the use is consistent with all of the terms and conditions of the permit.
7        The last grazing fees paid by Bundy to the BLM was for the period of December 1, 1992 to
8    February 28, 1993.  *See* Exhibit 7 to #11, Mot. Summ. Jud.  The last grazing application was for
9    the same period.  *See* Exhibit 8 to #11.  The government contends Bundy did not have
10   authorization to graze livestock on the Allotment after February 28, 1993.
11       On February 26, 1993, Bundy sent an Administrative Notice of Intent to the BLM, which
12   stated his intent to graze cattle "pursuant to my vested grazing rights."  *See* Exhibit 10 to #11.
13   Bundy sent several more Administrative Notice[s] of Intent in the months that followed.  On June
14   16, 1993, the BLM sent Bundy a letter informing him that his application had not been received to
15   graze livestock for the June 15, 1993 to August 31, 1993 period.  The BLM included another
16   application for Bundy to fill out and return.  *See* Exhibit 12 to #11.  Bundy responded to the BLM
17   letter with another Administrative Notice and Intent, stating, among other things, that the BLM has
18   produced no documents showing it had jurisdiction over the public lands.  *See* Exhibit 13 to #11.
19   The BLM began trespass detection efforts at the end of June 1993.
20       On July 13, 1993, the BLM sent Bundy a Trespass Notice and Order to Remove and gave
21   him ten days to respond.  As requested by Bundy, the BLM informed Bundy in a July 27, 1993
22   letter that it would extend the response time to 30 days.  On August 19, 1993, Bundy sent another
23   Administrative Notice and Intent, stating the BLM lacked proof that it had jurisdiction.  *See*
24   Exhibit 16 to #11.
25       On January 24, 1994, the BLM delivered a Proposed Decision Order to Remove and
26   Demand for Payment to Bundy by placing it on the dashboard of Bundy's vehicle while he was in

2

1   the vehicle.  BLM officials allege that Bundy became agitated, walked out of his truck and accused

2   the BLM of harassing him.  He then returned to his truck, threw the decision out of the window

3   and drove away.  One of Bundy's sons then picked up the decision, tore it into pieces and threw it

4   on the ground.

5       On February 17, 1994, the BLM issued a final decision canceling Bundy's ephemeral range

6   grazing permit.  On March 3, 1994, Bundy sent a check for $1,961.47 to Clark County for grazing

7   fees.  The BLM calculated that this amount is equal to the amount Bundy would pay to graze 85

8   cattle on the Allotment for a 12-month period if the fees were paid to the BLM in advance.  Clark

9   County returned the check to Bundy since it did not have jurisdiction over the Allotment.

10      In March and April of 1994, the BLM sent letters to Bundy requesting that he pay past due

11  bills for grazing fees.  Bundy responded by sending more administrative notices.  In December

12  1994, Bundy or his agents served a Constructive Notice on a contractor hired by the BLM to gather

13  wild horses and burros.   In August 1995, the BLM sent Bundy another Trespass Notice and Order

14  to Remove.  Bundy responded by sending a Constructive Notice and Order to Stop, in which he

15  again questioned the United States' authority to manage the Allotment.  See Exhibit 28 to #11.

16      In September 1997, the BLM tried to set up a meeting with Bundy to resolve the trespasses,

17  but Bundy declined to meet with the BLM.

18      The government contends it could have impounded Bundy's livestock, but it took no action

19  because any action could have resulted in physical confrontation.  Since the trespass detection

20  efforts began in late June of 1993, the BLM has kept a record of observed livestock grazing on the

21  Allotment.

22      On April 17, 1998, Bundy, a pro se defendant, filed his Answer and Motion to Dismiss

23  (#4).  Bundy alleged that this Court lacks jurisdiction to hear the case.  On July 22, 1998, the

24  United States filed a Motion for Summary Judgment (#11) requesting injunctive relief and

25  damages.

26

3

## II. DISCUSSION

**A.**   <u>Subject Matter Jurisdiction</u>

Bundy appears to argue in his Motion to Dismiss (#4) that the Complaint (#1) should be dismissed because this Court lacks jurisdiction since Article IV of the Constitution cannot be imposed upon him.  Bundy claims that he is a citizen of Nevada and not a citizen of a territory of the United States, and he also quotes religious texts.  Bundy also brings in the Property Clause, the Commerce Clause and International Treaty laws.  None of these statutes, laws or other citations is relevant to the jurisdictional issue.

Bundy is correct that federal courts have limited jurisdiction.  However, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.  Section 1331 provides that: "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *Duncan v. Stuetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996).  Section 1345 provides that: "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States ..." 28 U.S.C. § 1345; *United States v. State of Hawaii*, 832 F.2d 1116, 1117 (9th Cir. 1987).

This Court thus has subject matter jurisdiction under  28 U.S.C. § 1345 because this civil suit was commenced by the United States.

Federal laws regulating and managing federal public lands are involved in this case where the government alleges Bundy is grazing livestock on federal lands without authority and without paying the required fees.  Congress enacted the Taylor Grazing Act ("TGA"), 48 Stat. 1269, as amended, 43 U.S.C. § 315(f), in 1934 to regulate and preserve the federal lands.  *Public Lands Council v. Babbitt*, No. 96-80831998 WL 559362, at *1 (10th Cir..Sept. 1, 1998).  Recognizing that the TGA had not adequately protected the federal lands, Congress in 1976 enacted the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785.  *Id.* at *2.  The FLPMA provides that "the Attorney General may institute a civil action in any United States district court for an injunction or other appropriate order to prevent any person from utilizing public lands in

4

1   violation of regulations issued by the Secretary under this Act." 43 U.S.C. § 1733(b). This Court

2   therefore has jurisdiction under the FLPMA.

3         In his Reply (#7), Bundy explains this action started in 1992 when he received a "Full

4   Force and Effect Decision Bunkerville Allotment" from the BLM. Reply (#7), p. 5. The letter to

5   which Bundy refers is in fact dated January 28, 1993. Bundy claims this "decision concerning the

6   Desert Tortoise, if fully implemented, would lead to the end of ranching in Clark County," and his

7   ranching days would be over. Reply (#7), p. 5. The decision from the BLM does not inform

8   Bundy he can no longer graze livestock due to the protection of the Desert Tortoise, but instead

9   reminds Bundy that his grazing permit would end at the end of the next month, February 1993, and

10  the new permit application was attached to the decision. The decision informed Bundy the BLM

11  would issue him a new ten-year federal grazing permit for the Bunkerville Allotment. Mot. Dism.

12  (#4), Exh. E. The terms and conditions for the new federal grazing permit allowed for livestock

13  grazing with some restrictions to be determined by the BLM. For example, if tortoises were found

14  to be active in the early spring in a specific area, then grazing would not be allowed until the

15  amount of spring ephemeral forage had grown to a sufficient amount.

16        Bundy alleges the BLM does not have "Constitutional authority" to make the full force and

17  effect decision. The Property Clause of the United States Constitution gives Congress the power

18  "to dispose of and make all needful Rules and Regulations respecting the Territory or other

19  Property belonging to the United States." *United States v. Gardner* ("*Gardner II*"), 107 F.3d

20  1314, 1318 (9th Cir. 1997); U.S. CONST. art. IV, § 3, cl.2. This Congressional power over the

21  public lands is without limitations. *Gardner II*, 107 F.3d at 1318. Congress enacted the FLPMA,

22  which instructs the Secretary of the Interior to manage through the BLM the public lands under the

23  principles of multiple use and sustained yield. 43 U.S.C. § 1732(a). "Multiple use" requires

24  managing the public lands and their resources so that they "best meet the present and future needs

25  of the American people," and taking into account the long-term needs of future generations for

26  renewable and nonrenewable resources, including recreation, timber, wildlife and fish and

5

1    scientific values. 43 U.S.C. § 1702(c). "Sustained yield" is defined as "the achievement and

2    maintenance in perpetuity of a high-level annual or regular periodic output of the various

3    renewable resources of the public lands consistent with multiple use." *Id.* § 1702(h).

4         The FLPMA provides the Secretary of the Interior with the authority to regulate grazing

5    and issue grazing permits that require permittees to adhere to the terms and conditions of such

6    permits. *Id.* § 1752(a).  The Allotment is administered by the Secretary of the Interior through the

7    BLM, thus the BLM had authority to issue the full force and effect decision.  The Allotment where

8    Bundy and his father before him have been grazing livestock is classed as an ephemeral region,

9    which does not consistently produce forage.  The BLM has authority under the FLPMA to place

10   restrictions on grazing when the forage declines to a level  that would defeat the goals of multiple

11   use and sustained yield.

12   **B.**      **Summary Judgment**

13        Summary judgment may be granted when, viewed in the light most favorable to the

14   nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);

15   *Intel Corp. v. Hartford Acc. and Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991), "the pleadings,

16   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

17   show that there is no genuine issue as to any material facts and that the moving party is entitled to

18   judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

19   (1986).  Summary judgment shall be entered "against a party who fails to make a showing

20   sufficient to establish the existence of an element essential to that party's case, and on which that

21   party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Summary judgment shall

22   not be granted if a reasonable jury could return a verdict for the nonmoving party. *Anderson v.*

23   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

24        The moving party bears the initial burden of showing the absence of a genuine issue of

25   material fact. *Celotex*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to set forth

26   specific facts demonstrating a genuine factual issue for trial. *Matsushita*, 475 U.S. at 588-87; Fed.

6

1  R. Civ. P. 56(e).  The nonmoving party may not rest upon the mere allegations or denials of his or

2  her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials

3  provided by Rule 56(e), showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 256; Fed.

4  R. Civ. P. 56(e).  The evidence of the nonmoving party is to be believed, and all justifiable

5  inferences are to be drawn in the nonmoving party's favor. *Anderson*, 477 U.S. at 255; Fed. R.

6  Civ. P. 56(e).

7         Bundy argues in his Opposition to Motion for Summary Judgment (#14) that the Court

8  should strike the government's Motion for Summary Judgment (#11) because his Motion to

9  Dismiss (#4) has not been ruled upon and thus the government's motion is "premature and

10 unnecessary."  Bundy's argument is unpersuasive.  The plaintiff may move for summary judgment

11 at any time more than twenty days after the commencement of the action.  Fed. R. Civ. P. 56(a); *G*

12 *& G Fire Sprinklers, Inc. v. Bradshaw*, Nos. 95-56639, 96-55194, 1998 WL 596442, at *9 (9th

13 Cir. September 10, 1998).  The government filed the Complaint (#1) on March 27, 1998, and it

14 filed its Motion for Summary Judgment (#11) on July 22, 1998, almost four months later.

15        Bundy argues since this Court does not have jurisdiction, it must deny the Motion for

16 Summary Judgment (#11).  Bundy's argument fails again.  Bundy's citation of *Steel Co. v.*

17 *Citizens for a Better Environment*, 118 S. Ct. 1003 (1998), does not help his case.  The Supreme

18 Court in *Steel* stated: "Without jurisdiction the court cannot proceed at all in any cause." *Id.* at

19 1012. The Steel Court frowned upon "hypothetical jurisdiction" where courts assume jurisdiction

20 for the purpose of deciding the merits of cases.  *Id.*   However, this Court is not assuming

21 jurisdiction where none exist; this Court has federal question jurisdiction and the United States is a

22 party.  Therefore, Bundy's jurisdictional argument must fail.

23 C.    <u>Federal Lands</u>

24        Bundy argues the federal government cannot have authority over lands "inside an admitted

25 state." *See* Motion to Dismiss (#4), p. 10.  That argument must fail because federal lands located

26 within states are federal territories under federal jurisdiction.  The FLPMA provides:

7

1   The term "public lands" means any land and interest in land owned by the United
States within the several States and administered by the Secretary of the Interior
2   through the Bureau of Land Management, without regard to how the United States
acquired ownership, except –
3
    (1) lands located on the Outer Continental Shelf; and
4   (2) lands held for the benefit of Indians, Aleuts, and Eskimos.

5   43 U.S.C. § 1702(e).   The Bunkerville Allotment where Bundy is grazing his livestock falls

6   within the definition of "public lands" administered by the Secretary of the Interior through the

7   BLM.

8          An examination of the history of the lands in question further establishes federal

9   ownership. On May 13, 1846, the United States declared war on Mexico.  The Treaty of

10  Guadalupe Hidalgo ("Treaty"), 9 Stat. 922 (1848), which ended the war, was signed by the United

11  States Congress on February 2, 1848 and ratified by the Mexican Congress on May 25, 1848.

12         In the Treaty, Mexico ceded land to the United States, including land that is now Nevada.

13  *Gardner II*, 107 F.3d at 1317. Where Mexico before the Treaty included land that is now

14  California, Nevada, Arizona, New Mexico, Colorado, Texas and Utah, the Treaty drew the new

15  boundary line starting at the Gulf of Mexico, opposite the mouth of the Rio Grande, following the

16  river until the southern boundary of New Mexico, then westward until it touches the first branch of

17  the River Gila River, then westward until it empties into the Colorado River, then to the Pacific

18  Ocean. 9 Stat. 922, 926, Article V; *see also* Encyclopedia Britannica, Micropedia, 15th ed., vol. 5

19  at 528.  The public lands in Nevada are the property of the United States because the United States

20  has held title to those public lands since 1848, when Mexico ceded the land to the United States.

21  *Gardner II*, 107 F.3d at 1318.

22         Summary judgment shall be entered "against a party who fails to make a showing

23  sufficient to establish the existence of an element essential to that party's case, and on which that

24  party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Bundy has failed to make

25  such a showing.  He has set forth no specific facts showing a genuine factual issue for trial.  *See*

26  *Matsushita*, 475 U.S. at 588-87; Fed. R. Civ. P. 56(e).  Although courts construe liberally

8

1    pleadings of pro se litigants such as Bundy in their favor, pro se litigants are still bound by the

2    rules of procedure. *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995); *King v. Atiyeh*, 814 F.2d

3    565, 567 (9th Cir. 1987). As the nonmoving party, Bundy may not rest upon the mere allegations

4    or denials of his pleadings, but he must produce specific facts, by affidavit or other evidentiary

5    materials, showing there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256; Fed. R. Civ.

6    P. 56(e). Bundy has produced no specific facts, but instead has argued that this Court has no

7    jurisdiction. Bundy's failure to produce specific facts showing a genuine issue for trial gives the

8    Court sufficient grounds to grant the Motion for Summary Judgment (#11).

9    D.    Injunctive Relief

10          Injunctive relief is appropriate when the moving party shows irreparable injury will result

11    and remedies at law are inadequate. *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998). The

12    moving party must show actual success on the merits and the balance of equities favors injunctive

13    relief. *Id.* As stated above, the United States owns the Allotment where Bundy is grazing his

14    livestock. Bundy is therefore trespassing upon United States property. Trespass is defined as

15    entering the real property of another without the owner's permission or invitation. *United States v.*

16    *Gardner* ("*Gardner I*"), 903 F. Supp. 1394, 1402 (D. Nev. 1995) (citing Restatement Second

17    of Torts, §§ 158-59). The Restatement of Torts provides that:

18
19          One is subject to liability to another for trespass... if he intentionally

          (a) enters land in the possession of the other, or causes a thing ... to do so, or

20          (b) remains on the land, or

21          (c) fails to remove from the land a thing which he is under a duty to remove.

22    Restatement Second of Torts, §§ 158-59. Grazing on federal public lands without a permit is

23    a grazing trespass. *Holland Livestock Ranch v. United States*, 655 F.2d 1002, 1005 (9th Cir.

24    1981).

25          *Gardner I* had facts similar to this case, where the defendants grazed livestock without

26    authority. A permanent injunction was entered against the defendants; they were ordered to

<div align="center">9</div>

1   remove the livestock, and pay the owed grazing fees. *Gardner I*, 903 F. Supp. at 1403. As in

2   *Gardner I*, the United States prevails in this case on the merits since Bundy is trespassing. The

3   other component of the test requiring a showing of irreparable injury and inadequate remedies at

4   law has also been met by the United States. Bundy has been grazing his livestock on the

5   Allotment without a permit since March 1993, and he has informed the BLM in several

6   "administrative notices" that he intends to graze cattle "pursuant to my vested grazing rights." *See*

7   Exhibit 10 to #11. Despite numerous trespass notices and demands for payment from the BLM,

8   Bundy has grazed livestock on the Allotment. Irreparable harm is established in cases of

9   continuing trespasses. *See, e.g., Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 892 (1st Cir. 1988)(a

10   continuing trespass on real property can properly be enjoined); *New York State Nat'l Org. for*

11   *Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989)(defendants' stated intent to continue illegal

12   actions showed harm was of a continuing nature and permanent injunction properly issued).

13         Section 4140.1 of the Code of Federal Regulations prohibits unauthorized grazing of

14   livestock on public lands. 43 C.F.R. § 4140.1(b)(1)(i) (1998). Any person who violates the

15   grazing regulations as set forth under 43 C.F.R. § 4140.1(b) is subject to civil and criminal

16   penalties. 43 C.F.R. §§ 4140.1(b), 4170.1, 4170.2. The regulations provide that the settlement for

17   repeated willful violations is three times the value of the forage consumed by the livestock as

18   determined by the average monthly rate per AUM (animal unit month)[1]. 43 C.F.R. § 4150.3. The

19   BLM is also authorized to impound and dispose of the unauthorized livestock after written notice

20   of intent to impound. 43 C.F.R. §§ 4150.2, 4150.4, 4150.4-1, 4150.4-2; *see also Klump v. United*

21   *States*, 38 Fed. Cl. 243 (1997)(government had not violated takings clause in impounding cattle as

22   sanction for unauthorized grazing on federal lands). The government alleges that the BLM has not

23   impounded Bundy's livestock due to its anticipation the action could result in physical

24   confrontation. *See* Mot. Summ. Jud., #11, pp. 11-12. For over five years, Bundy has been

25   _____

26   [1]An animal unit month is the amount of forage necessary for the sustenance of one cow for one
month.

10

1    trespassing on public lands and his livestock have consumed forage. The government has shown
2    commendable restraint in allowing this trespass to continue for so long without impounding
3    Bundy's livestock.
4
5                                    **III. CONCLUSION**
6         This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1345. The United
7    States owns the Allotment where Bundy is grazing livestock without authority. Since Bundy is in
8    trespass on public lands,
9         IT IS ORDERED that Defendant's Motion to Dismiss (#4) is DENIED.
10        IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (#11) is
11   GRANTED as to the permanent injunction.
12        IT IS FURTHER ORDERED that Bundy is permanently enjoined from grazing his
13   livestock within the Bunkerville Allotment and shall remove his livestock from this allotment on
14   or before November 30, 1998.
15        IT IS FURTHER ORDERED that Plaintiff United States shall be entitled to trespass
16   damages from Bundy in the amount of $200.00 per day per head for any livestock belonging to
17   Bundy remaining on the Bunkerville Allotment after November 30, 1998.
18        IT IS FURTHER ORDERED that Defendant's Motion to Strike Motion for Summary
19   Judgment (#14) is DENIED.
20        The Clerk shall enter judgment accordingly.
21        DATED this 3rd day of November, 1998.
22
23
24                                    _Johnnie B. Rawlinson_
25                                    JOHNNIE B. RAWLINSON
                                      United States District Judge
26

                                        11

# ATTACHMENT D

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**F I L E D**

MAY 1 4 1999

CATHY A. CATTERSON
CLERK, U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>CLIVEN D. BUNDY,<br><br>Defendant-Appellant. | No. 98-17293<br><br>D.C. No. CV-98-531-JBR<br><br>MEMORANDUM[1]<br><br>**FILED**<br>JUL 2 2 1999<br>CLERK, U.S. DISTRICT COURT<br>DISTRICT OF NEVADA<br>_____ DEPUTY |

Appeal from the United States District Court
for the District of Nevada
Johnnie B. Rawlinson, District Judge, Presiding

Submitted May 10, 1999[2]

Before:    REINHARDT, TROTT, and MCKEOWN, Circuit Judges.

Cliven D. Bundy appeals pro se from the district court's entry of summary

judgment for the United States in its action for trespass and to enjoin Bundy from

grazing his livestock on land administered Bureau of Land Management.  We have

---

[1]    This disposition is not appropriate for publication and may not be cited to or by the courts
of this circuit except as may be provided by 9th Cir. R. 36-3.

[2]    The panel unanimously finds this case suitable for decision without oral argument. *See*
Fed. R. App. P. 34(a)(2).

jurisdiction under 28 U.S.C. § 1291.  We review de novo the district court's entry

of summary judgment, *see United States v. Gardner*, 107 F.3d 1314, 1317 (9th

Cir. 1997), and we affirm.

Bundy contends that the district court erred by exercising jurisdiction over

the action.  For the reasons stated by the district court in its November 4, 1998

order, we reject Bundy's contention.

**AFFIRMED.**

A TRUE COPY
ATTEST                    JUL - 7 1999
CATHY A. CATTERSON
Clerk of Court

_____
Deputy Clerk

2

# ATTACHMENT E

United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Las Vegas Field Office
4701 North Torrey Pines Dr
Las Vegas NV 89130
www.blm.gov/nv/



In Reply Refer to:
4120
(NV052.08)

CERTIFIED MAIL:    7006 0100 0000 5253 5309
RETURN RECIEPT REQUESTED

[APR 2 - 2008

Cliven D. Bundy
7175 Gold Butte Road
Bunkerville NV 89007

## NOTICE OF CANCELLATION

Dear Mr. Bundy:

This letter is a Notice of Cancellation of your Range Improvement Permit and Cooperative Agreements.

**Background**

The Bureau of Land Management (BLM), Las Vegas Field Office issued you a Final Decision on February 17, 1994 that cancelled your ephemeral grazing lease for the Bunkerville Allotment. The Decision was neither protested nor appealed.

**Notice of Cancellation of Range Improvement Permits and Cooperative Agreements**

**Section 4 Range Improvement Permits**

Your Section 4 range improvement permit is hereby cancelled and you are given notice that you have 180 days from the receipt of this Notice of Cancellation to remove all materials and clean up all debris placed on Public lands from the following Section 4 range improvement:

| Project Name | Project Number |
|---|---|
| Red Springs Drift Fence, (a.k.a., Red Springs Division Fence) | 575160 |

Remove the all wire, fence posts, h-braces, anchors, gates and associated hardware and debris associated with the Red Springs Drift (Division) Fence; no surface disturbance is permitted. Permit for project 575160 is cancelled.

Failure to remove the materials from the above section 4 range improvement within 180 days from the receipt of this notice is a prohibitive act under 43 CFR 4140.1 (a)(4) and (5). Therefore, Cliven Bundy will be considered in trespass. If the materials are not removed, the trespass may result in the BLM removing the materials, rehabilitating the site and the BLM may charge Cliven Bundy for the costs of removal and rehabilitation under 43 CFR 2808.11(a)(3).

1

The following projects are the property of the United States of America.  According to the cooperative agreement for these projects, Cliven Bundy is no longer responsible for their maintenance and shall not attempt to remove any materials from these projects under the Cooperative Agreements, which are now cancelled.  The Cooperative Agreements state in stipulation 5 (a) "Title to the said improvements in place, together with all labor and materials furnished by either party and used in construction and maintenance thereof, shall be in the United States of America."

| Project Name | Project |
|---|---|
| Nickle Creek Truck Trail | 570185 |
| South Well (Trough) | 570182 |
| White Rock Spring | 570223 |
| Jump Spring Development | 570180 |
| Black Rock Spring | 570221 |
| Sheep Trough Water Development | 570176 |
| Key West Seasonal Use Fence | 570749 |
| Culinary Pipeline | N5-4-42 |
| Darling Pipeline | N5-4-42 |
| Sheep Trough Pipeline | N5-4-42 |

## Authority

The authority for this decision is contained in Title 43 of the Code of Federal ]
Subpart 4120-Grazing Management, which states in pertinent parts:

2808.11(a)(3)  "Rehabilitation and restoring any damaged lands or resources.  If you do not rehabilitate and restore the lands and resources within the time set by BLM in the notice, you will be liable for the costs the United States incurs in rehabilitating and restoring the lands and resources."

4120.3-6(b)   "The authorized officer may require permittees or lessees to remove range improvements which they own on the Public lands if these improvements are no longer helping to achieve land use plan or allotment goals and objectives or if they fail to meet the criteria under 4120.3-4 of this title.

4120.3-6(d)   "Permittees and lessees shall be allowed 180 days from the date of cancellation of a range improvement permit or cooperative range improvement agreement to salvage material owned by them and perform rehabilitation measure necessitated by the removal.

4140.1(a)(4)  "Grazing permittees or lessees performing the following prohibitive acts may be subject to civil penalties under 4170.1": "Failing to comply with the terms, conditions, and stipulations of cooperative range improvement agreements or range improvement permits."

4140.1(a)(5)  "Refusing to install, maintain, modify, or remove range improvements when so directed by the authorized officer."

2

Appeals

A person who wishes to appeal to the Interior Board of Land Appeals must do so under 43 CFR 4.411 and must file in the office of the officer who made the decision (not the Board), in writing to Patrick Putnam, Assistant Field Manager, Las Vegas Field Office, 4701 North Torrey Pines Drive, Las Vegas NV 89130. A person served with the decision being appealed must transmit the notice of appeal in time to be filed in the office where it is required to be filed within 30 days after the date of service. The notice of appeal must give the serial number or other identification of the case and may include a statement of reasons for the appeal, a statement of standing if required by subpart 4.412(b), and any arguments the appellant wished to make. Form 1842-1 (attached) provides additional information regarding filing an appeal.

No extension of time will be granted for filing the notice of appeal. If a notice of appeal is filed after the grace period provided in subpart 4.401(a), the notice of appeal will not be considered and the officer from whose decision the appeal is taken will close the case. If the notice of appeal is filed during the grace period provided in subpart 4.401(a) and the delay in filing is not waived, as provided in that section, the notice of appeal will not be considered and the Board will dismiss the appeal.

The appellant shall serve a copy of the notice of appeal and any statements of reason, written arguments, or briefs under §4.413 on each adverse party named in the decision from which the appeal is taken and on the Office of the Solicitor, Pacific Southwest Regional Solicitor, U.S. Department of the Interior, 2800 Cottage Way, Room E-2753, Sacramento, California 95825-1890. Service must be accompanied by personally serving a copy to the party or by sending the document by registered or certified mail, return receipt requested, to the address of record in the bureau, no later than 15 days after filing the document.

In addition, within 30 days of receipt of this decision you have the right to file a petition for a stay of the decision together with your appeal in accordance with the regulations at 43 CFR 4.21. The petition must be served upon the same parties specified above. Should you wish to file a petition for stay, the appellant shall show sufficient justification based on the following standards:

(1) The relative harm to the parties if the stay is granted or denied.
(2) The likelihood of the appellant's success on the merits.
(3) The likelihood of immediate and irreparable harm if the stay is not granted, and
(4) Whether the public interest favors granting the stay.

43 CFR 4.471(d) provides that the appellant requesting a stay bears the burden of proof to demonstrate that a stay should be granted.

At the conclusion of any document that a party must serve, the party or its representative must sign a written statement certifying that service has been or will be made in accordance with the applicable rules and specifying the date and manner of such service (43 CFR 4.422(c)(2)).

Patrick Putnam
Assistant Field Manager


Enclosures:       Form 1842-1
                  Copies of Range Improvement Permit and Cooperative Agreements

3

Cc:
Donald & Connie Whitney
Harold & Annita Wittwer
The Nature Conservancy
Lewis Wallenmeyer
Meghan Wereley
Mandy McNitt
Glen Anderson
Scott Florence
M. Joe Tague
Leon Sprouse
Robert Lewis
Kent Turner
Keith Brose
Ray Klein

4

Form 1842-1
(September 2005)

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT

## INFORMATION ON TAKING APPEALS TO THE INTERIOR BOARD OF LAND APPEALS

### DO NOT APPEAL UNLESS
1. This decision is adverse to you,
AND
2. You believe it is incorrect

### IF YOU APPEAL, THE FOLLOWING PROCEDURES MUST BE FOLLOWED

| | |
|---|---|
| **1. NOTICE OF APPEAL**.............. | A person served with the decision being appealed must transmit the notice of appeal in time for it to be filed in the office where it is required to be filed within 30 days after the date of service. If a decision is published in the FEDERAL REGISTER, a person not served with the decision must transmit a notice of appeal in time for it to be filed within 30 days after the date of publication (43 CFR 4.411 and 4.413). |
| **2. WHERE TO FILE NOTICE OF APPEAL**........... | U.S. Dept. of the Interior<br>Bureau of Land Management<br>4701 North Torrey Pines Drive<br>Las Vegas NV 89130   **And**   U.S. Dept. of the Interior<br>Office of Hearings & Appeals<br>Interior Board of Land Appeals<br>801 N. Quincy St., MS 300-QC<br>Arlington, VA 22203 |
| **WITH COPY TO SOLICITOR**................... | U.S. Dept. of the Interior<br>Office of the Solicitor<br>Pacific Southwest Region<br>2800 Cottage Way, Room E-2753<br>Sacramento, CA 95825-1890 |
| **3. STATEMENT OF REASONS** | Within 30 days after filing the Notice of Appeal, File a complete statement of the reasons why you are appealing. This must be filed with the United States Department of the Interior, Office of Hearings and Appeals, Interior Board of Land Appeals, 801 N. Quincy Street, MS 300-QC, Arlington, Virginia 22203. If you fully stated your reasons for appealing when filing the Notice of Appeal, no additional statement is necessary (43 CFR 4.412 and 4.413). |
| **WITH COPY TO** ...................... | U.S. Dept. of the Interior<br>Office of the Solicitor<br>Pacific Southwest Region<br>2800 Cottage Way, Room E-2753<br>Sacramento, CA 95825-1890   **And**   U.S. Dept. of the Interior<br>Bureau of Land Management<br>4701 North Torrey Pines Drive<br>Las Vegas NV 89130 |
| **4. ADVERSE PARTIES**................. | Within 15 days after each document is filed, each adverse party named in the decision and the Regional Solicitor or Field Solicitor having jurisdiction over the State in which the appeal arose must be served with a copy of: (a) the Notice of Appeal, (b) the Statement of Reasons, and (c) any other documents filed (43 CFR 4.413). If the decision concerns the use and disposition of public lands, including land selections under the Alaska Native Claims Settlement Act, as amended, service will be made upon the Associated Solicitor, Division of Land and Water Resources, Office of the Solicitor, U.S. Department of the Interior, Washington, D.C. 20240. If the decision concerns the use and disposition of mineral resources, service will be made upon the Associated Solicitor, Division of Mineral Resources, Office of the Solicitor, U.S. Department of the Interior, Washington, D.C. 20240. |
| **5. PROOF OF SERVICE**............... | Within 15 days after any document is served on an adverse party, file proof of that service with the United States Department of the Interior, Office of Hearings and Appeals, Interior Board of Land Appeals, 801 N. Quincy Street, MS 300-QC, Arlington, Virginia 22203. This may consist of a certified or registered mail "Return Receipt Card" signed by the adverse party (43 CFR 4.401(c)). |
| **6. REQUEST FOR STAY**............ | Except where program-specific regulations place this decision in full force and effect or provide for an automatic stay, the decision becomes effective upon the expiration of the time allowed for filing an appeal unless a petition for a stay is timely filed together with a *Notice of Appeal* (43 CFR 4.21). If you wish to file a petition for a stay of the effectiveness of this decision during the time that your appeal is being reviewed by the Interior Board of Land Appeals, the petition for a stay must accompany your notice of appeal (43 CFR 4.21 or 43 CFR 2804.1). A petition for a stay is required to show sufficient justification based on the standards listed below. Copies of the *Notice of Appeal* and Petition for a Stay must also be submitted to each party named in this decision and to the Interior Board of Land Appeals and to the appropriate Office of the Solicitor (43 CFR 4.413) at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.<br><br>Standards for Obtaining a Stay. Except as other provided by law or other pertinent regulations, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards: (1) the relative harm to the parties if the stay is granted or denied, (2) the likelihood of the appellant's success on the merits, (3) the likelihood of immediate and irreparable harm if the stay is not granted, and (4) whether the public interest favors granting the stay. |

(Continued on page 2)

Unless these procedures are followed your appeal will be subject to dismissal (43 CFR 4.402). Be certain that all communications are identified by serial number of the case being appealed.

**NOTE:** A document is not filed until it is actually received in the proper office (43 CFR 4.401(a)). See 43 CFR Part 4, subpart b for general rules relating to procedures and practice involving appeals.

## 43 CFR SUBPART 1821--GENERAL INFORMATION

Sec. 1821.10  Where are BLM offices located? (a) In addition to the Headquarters Office in Washington, D.C. and seven national level support and service centers, BLM operates 12 State Offices each having several subsidiary offices called Field Offices. The addresses of the State Offices can be found in the most recent edition of 43 CFR 1821.10. The State Office geographical areas of jurisdiction are as follows:

STATE OFFICES AND AREAS OF JURISDICTION:

Alaska State Office ---------- Alaska
Arizona State Office --------- Arizona
California State Office ------- California
Colorado State Office -------- Colorado
Eastern States Office --------- Arkansas, Iowa, Louisiana, Minnesota, Missouri
                                          and, all States east of the Mississippi River
Idaho State Office ------------- Idaho
Montana State Office --------- Montana, North Dakota and South Dakota
Nevada State Office ----------- Nevada
New Mexico State Office ---- New Mexico, Kansas, Oklahoma and Texas
Oregon State Office ----------- Oregon and Washington
Utah State Office ------------- Utah .
Wyoming State Office -------- Wyoming and Nebraska

(b) A list of the names, addresses, and geographical areas of jurisdiction of all Field Offices of the Bureau of Land Management can be obtained at the above addresses or any office of the Bureau of Land Management, including the Washington Office, Bureau of Land Management, 1849 C Street, NW, Washington, DC 20240.

(Form 1842-1, September 2005)