# ATTACHMENT F



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy St. Suite 300
Arlington, VA  22203

703 235 3750                                    703 235 8349 (fax)

December 22, 2008

| | | |
|---|---|---|
| IBLA 2008-207 | ) | NV052.08 |
| | ) | |
| CLIVEN D. BUNDY | ) | Notice of Cancellation |
| | ) | |
| | ) | Affirmed |

## ORDER

Cliven D. Bundy appeals from a Notice of Cancellation, issued April 2, 2008, by the Las Vegas Field Office, Bureau of Land Management (BLM), cancelling a Range Improvement Permit for the Red Springs Drift Fence, Project Number 575160, and ten Cooperative Agreements, Project Numbers 570185, 570182, 570223, 570180, 570221, 570176, 570749, N5-4-4291, N5-4-4290, and N5-4-4289.  The Range Improvement Permit and the Cooperative Agreements were issued between 1966 and 1985 to Bundy, his father, and in some cases also to other individuals, to allow improvements for grazing on the public lands of the United States on the Bunkerville Allotment in Clark County, Nevada.  In response to the Notice of Cancellation, Bundy served a "Constructive Notice" Letter on BLM, which BLM construes as a Notice of Appeal.  Because Bundy has not argued or demonstrated error in BLM's Notice of Cancellation, we affirm.

### Background

This case represents another chapter in a long-running dispute between Bundy and BLM in which Bundy contends that he has "'unalienable' pre-emptive" rights with respect to use of the public lands for grazing in association with his ranch.  Although he has been disabused of this notion by Federal courts, which have held him to be in trespass and enjoined his continued use of the public lands for grazing, Bundy continues to act in disregard of the law by grazing cattle on the public lands.[1]

The record shows that sometime around 1954, Bundy or his father David Bundy began to graze livestock on the public lands in the Bunkerville Allotment with

---

[1]  The background information regarding the permit and its history is found in the decision of the United States District Court for the District of Nevada.  *United States v. Cliven D. Bundy*, CV-S-98-531-JBR (RJJ) (D. Nev. Nov. 4, 1998).

ephemeral grazing permits issued pursuant to the Taylor Grazing Act of 1934, 43 U.S.C. § 315-315r (2000), for preference awarded to a predecessor grazer in association with base property. As an ephemeral authorization, the Allotment only provided forage resources randomly depending on natural conditions, and therefore BLM determined on an annual basis what forage was available.[2]

On May 20, 1966, David Bundy entered into six Cooperative Agreements with BLM, authorizing various range improvements for the Bunkerville Allotment. Record Documents 16-21. The agreements specified that title to all improvements was in the United States, see section 5(a), and that the agreements could be terminated, inter alia, by BLM "after due notice in writing" because of default or violation by the "cooperator," see section 11. In 1968, David Bundy was one of five "cooperators" who entered into another Cooperative Agreement with BLM with the same terms. Record Document 15. David Bundy entered into three more Cooperative Agreements in 1973, with the same terms. Record Documents 11-13.

In 1973, David and Cliven D. Bundy entered into a Designation of Authority ensuring that the two could represent each other's interests. Record Document 14. On December 5, 1985, BLM issued a Range Improvement Permit to Bundy and several neighbors for the Red Rock Springs Drift Fence. This permit divided the Bunkerville and Gold Butte Allotments, and was subject to cancellation both for failure of the permittee(s) to comply with applicable regulations, and also if the improvement ceased to be compatible with multiple use objectives for the area. Record Document 10.

During the early 1990s, BLM developed management plans for the desert tortoise and its habitat, which are found within the Bunkerville Allotment. Such plans would impose timing constraints on grazing authorizations within the Allotment depending on tortoise sightings. Accordingly, in 1993, BLM advised Bundy in its annual notice that changes would take place in future permits.

Bundy's last authorization to graze the Bunkerville Allotment ended on February 28, 1993, but he continued to graze cattle on the Allotment and refused to

---

[2]   "Ephemeral rangelands" are "areas of the Hot Desert Biome (Region) that do not consistently produce enough forage to sustain a livestock operation but may briefly produce unusual volumes of forage to accommodate livestock grazing." 43 C.F.R. § 4100.0-5 (2004). Special rules apply to ephemeral rangelands; permittees must apply for annual grazing authorizations which may be granted "whenever forage exists or climatic conditions indicate the probability of an ephemeral forage crop." 33 Fed. Reg. 18245 (Dec. 7, 1968); see Defenders of Wildlife, 144 IBLA 250, 251-52 (1998); Wild Horse Organized Assistance, 172 IBLA 128, 133 (2007).

apply for annual grazing authorizations, pay grazing fees, or otherwise cooperate with BLM in any way with respect to the Allotment. When BLM attempted to communicate with him, Bundy issued various written documents to BLM declaring his intent to graze pursuant to "vested grazing rights," and claimed that the United States did not own the public lands or have authority to exercise jurisdiction over the Allotment. In the summer of 1993, BLM issued various notices to Bundy, and finally issued a "Trespass Notice and Order to Remove" livestock.

On January 24, 1994, BLM issued a Proposed Decision, Order to Remove, and Demand for Payment. Record Document 9. After documenting violations of law and regulation, the Proposed Decision cancelled Bundy's grazing preference in the Bunkerville Allotment which was attached to base properties that had been acquired by his father no later than 1966. *Id.* In the absence of a response or Notice of Appeal, this decision became final on February 17, 1994. Bundy continued to deny the United States' authority over the public lands and to commit actions in pursuit of grazing on the public lands of the Allotment.

In 1998, the United States filed a complaint against Bundy in the United States District Court for the District of Nevada. In its opinion dated November 4, 1998, the District Court explained the law to Bundy in considerable detail, as well as the United States' authority, as set forth in the United States Constitution, over public lands acquired by the Treaty of Guadalupe Hidalgo and managed by Congress in the Taylor Grazing Act and in the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701-02, 1732, 1752 (2000). *United States v. Cliven D. Bundy*, CV-S-98-531-JBR (RJJ) (D. Nev. Nov. 4, 1998); *see also Public Lands Council v. Babbitt*, 529 U.S. 727 (2000). The Court permanently enjoined Bundy from grazing his livestock on the Bunkerville Allotment, ordered him to remove all livestock from the public lands, and granted damages to the United States. Bundy appealed to the United States Court of Appeals for the Ninth Circuit, which denied his appeal by Memorandum Order. *United States of America v. Cliven D. Bundy*, No. 98-17293 (9th Cir. July 22, 1999).

BLM has documented Bundy's continued use of range improvements on the Bunkerville Allotment, *see* Record Document 9, and contends that Bundy has never complied with the Federal court mandates. On April 2, 2008, BLM issued to Bundy a Notice of Cancellation for the 1985 Range Improvement Permit, Project No. 575160, and for all ten Cooperative Agreements. BLM explained that Bundy was obligated to remove all materials associated with the Red Rock Springs Drift Fence and that failure to comply with the Notice would be a prohibited act pursuant to 43 C.F.R. § 4140.1(a). BLM explained that Bundy's failure to comply would constitute a trespass pursuant to 43 C.F.R. § 2808.11(a)(3), such that BLM could remove materials in trespass, rehabilitate the site, and charge Bundy for its costs. Notice of Cancellation at 1. With respect to the Cooperative Agreements, BLM advised Bundy

IBLA 2008-207

that pursuant to section 5 of each agreement, title to all improvements belonged in the United States. BLM cited, as authority for the Notice, 43 C.F.R. §§ 2802.122, 4120.3-6, and 4140.1. The Notice, at 3, advised Bundy of his right to appeal. It was served on one organization and 15 individuals.

On May 13, 2008, Bundy served on BLM a "Constructive Notice."[3] Bundy asserts that he has "managed [his] ranch adhering to state and local law and customs," and that his ranch is a working unit on **Fee Lands** in Clark County, Nevada, Bunkerville and Overton Townships, and the City of Mesquite, Nevada, U.S.A." In the only statement of objection to the Notice of Cancellation, Bundy asserts: "By inhibiting me from maintaining and improving my vested water rights, access roads, division fences and also drift fences, BLM could stifle my 'unalienable' pre-emptive forage, water, and access rights within the area of my ranch." He asserts that "continued efforts through **whatever it takes**, to protect my rights and solve the people's concern, will be taken." BLM made and documented efforts to communicate with Bundy to ascertain whether his Constructive Notice was intended as an appeal, but BLM received no response from him. Record Documents 2-3.

BLM submitted a response to the Constructive Notice. Bundy submitted no further pleadings.

*Analysis*

While those with grazing preferences and permits have particular rights pursuant to the Taylor Grazing Act, *see, e.g., Joe B. Fallini v. BLM,* 162 IBLA 10 (2004), *and cases cited,* Bundy no longer has such rights as his grazing preference was terminated well over a decade ago, and he has been adjudicated by a Federal Court to be a trespasser on the public lands. Bundy therefore maintains no particular rights under that statute or its implementing regulations.

As a party to the Range Improvement Permit and Cooperative Agreements associated with permits that have long since terminated, Bundy's burden is to show that BLM erred in construing those permits and their cancellation terms, or otherwise abused its discretion. In this direction, Bundy alludes to various unstated rights in association with his ranch, which he claims to be located on fee lands, but BLM has taken no action with respect to his ranch or fee lands.

Bundy's Constructive Notice fails to demonstrate error in BLM's decision. According to BLM, the ten Cooperative Agreements at issue in this appeal terminated

---

[3] Bundy correctly notes that he was served with the Notice of Cancellation on Apr. 15, 2008. Record Document 6 (Track and Confirm Receipt).

4

of their own terms in 1993, and Bundy has not averred any error in BLM's declaration as to their status, or the status of the improvements that the Agreements authorized years ago.[4]

Likewise, we find no basis in the Notice upon which to consider BLM to have erred in terminating the Red Rock Springs Drift Fence. The Notice of Cancellation orders Bundy to remove all fencing materials from the Red Rock Springs Drift Fence authorized under the 1985 Range Improvement Permit. This permit was issued to Bundy and his neighbors on the Gold Butte Allotment, and the fence was to serve as a physical barrier between the Bunkerville and Gold Butte Allotments, splitting the Red Rock Spring between the two for equal usage. Bundy was enjoined by the Federal Courts from grazing on the Allotment some years ago, and has no legal right to maintain any barrier to protect the stream from incursion by others. Bundy does nothing to refute the suggestion that the fence should be removed, as he continues to use the fence as a means of trespassing with his cattle on the Federal lands, nor does he contend that BLM abused its discretion in ordering his removal of the fence under 43 C.F.R. § 4120.3-6(b). While Bundy claims that the inability to maintain drift fences could affect rights to water "within the area of [his] ranch," he has no such rights on the public lands.[5]

Bundy's Constructive Notice demonstrates a continued misunderstanding of the nature of the public lands. We need not repeat the legal analysis provided to him by the United States District Court and refer Bundy to the decision adverse to him in the 1998 litigation, for answers to any questions of legal authority. *United States v. Cliven D. Bundy*, CV-S-98-531-JBR (RJJ) (D. Nev. Nov. 4, 1998), *aff'd,* No. 98-17293

---

[4] Several of the Cooperative Agreements were issued to Bundy and one or more grazers. Project Numbers 570749, 570182, 570223, 570176, 570221, 570180. The Notice of Cancellation was issued only to Bundy, but copied to a list of 15 individuals who may or may not be successors in interest to the grazers originally party to a particular cooperative agreement. BLM's retention of the improvements means that its decision would not affect the rights of any parties, if any remain, to use the improvements. Moreover, nothing in the Notice of Cancellation purports to have any bearing on improvements outside the Bunkerville Allotment.

[5] None of the parties on the service list has submitted an appeal from the Notice of Cancellation. Because we cannot identify the various persons served with the Notice, when the case is returned to its jurisdiction BLM is directed to verify that the rights of any persons who may maintain an interest in the fence, if any remain or succeeded to the 1985 Permit, have been protected by service of the Notice. Bundy does not suggest that any other person's right has been affected and we will not manufacture causes for him not articulated in his appeal.

IBLA 2008-207

(9th Cir. July 22, 1999).  That decision is *res judicata* as to the termination of his status as a permittee on the Bunkerville Allotment.  In addition, we recommend that Bundy review the Supreme Court's decision in *Public Lands Council v. Babbitt*, 529 U.S. 727 (2000).

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the Notice of Cancellation is affirmed.

Lisa Hemmer
Administrative Judge

I concur:

James Jackson
Administrative Judge

APPEARANCES:

Cliven D. Bundy
P.O. Box 7175
Bunkerville, NV   89007

Nancy S. Zahedi, Esq.
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA   95825

**TELEFAX:   (916) 978-5694**

RECEIVED

DEC 29 2008

Regional Solicitor
Pacific Southwest Region

6

# ATTACHMENT G

702 506 6161   P.02

---

**CLIVEN D. BUNDY**   #346-5564
P.O. Box 7175
Bunkerville, Nevada 89007
Tel: 702-346-5564

---

## CONSTRUCTIVE NOTICE AND DEMAND FOR PROTECTION

### November 27, 1998

TO:

**Sheriff Clark County, Nevada**
**District Attorney Clark County, Nevada**
**Commissioners Clark County, Nevada**
**Governor of Nevada**
**Governor Elect of Nevada**
**Attorney General of Nevada**
**Director - Nevada Division of Brand Inspection**
**Nevada Legislature**
**Any person aiding and abetting to destroy my Life, Liberty or Property**
*Chief Murphy*
RE:   Unconstitutional Jurisdiction Being Imposed Causing An Emergency

1. The above Nevada officials are hereby given constructive notice that an unconstitutional jurisdiction without limitations is being imposed upon me and my family's life, liberty and property. Because a court has ordered this upon me I fear for the well being and safety of me and my family because of what federal agents did at Ruby Ridge and Waco.  The Supreme Court has ruled this jurisdiction to be unconstitutional within a state. All I want to do is stand up for my rights and make sure no violence occurs.  The above officials are also given demand to intervene on my behalf against the United States and its agents enforcing this jurisdiction and prevent an emergency from escalating.  In addition, any person aiding and abetting the destruction of my rights is noticed that he will be held liable for their actions in a state court of proper jurisdiction.

2. This emergency is the result of several fiat rulings by the federal judiciary involving public lands matters here in Nevada, and the most recent ruling in United States v. Bundy, Case No. CV-S-98-531 JBR(RJJ). The court stated in part as follows:

   "Bundy alleges the BLM does not have 'Constitutional authority' to make the full force and effect decision.  The Property Clause of the United States Constitution gives Congress the power 'to make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.' (citation omitted); U.S. Const. art. IV Sec.3, cl.2.  This Congressional power over the public lands is without limitations." Order @Pg3, Ln16-31 (citation omitted)(emphasis added).

3. The United States and its agents started in 1992 to remove all livestock from the ranges in Clark County by means an arbitrary and capricious document titled Full Force and Effect Decision. The implementation of this decision has destroyed the livestock industry in Clark County and to the best of knowledge I am the last active Rancher to be removed.

4. I have consistently throughout this period been persistent in the defense of my vested rights and ability to perform the vocation of ranching guaranteed me in the Nevada constitution.  The United States and its agents

1

have obtained a ruling from a federal district court judge here in Las
Vegas that states I have no constitutional rights and that they can operate
against my life, liberty and property ~~without limitations~~. The judge in
this decision has also nullified Nevada Water Law. Furthermore, the court
creates a constitutional paradox even against its own judicial independence
through this ~~without limitations~~ ruling. Moreover, the federal courts in
this subject matter have in essence ruled that they have no power to limit
the federal agents when oppressing the rights of the People in Nevada.

5. In my motion to dismiss I put before the court numerous Supreme Court cases
which hold that Art IV is the authority Congress implements when governing
areas obtained through conquest or purchase from another nation. in the
international theater. The case law is clear that matters in this Art IV
authority shall only be adjudicated by special Art IV courts within the
conquered or purchased territory that have been established by congress.

6. Art IV courts are to cease operation once a state is admitted into the
union. Accordingly, would not this without limitations authority also
cease? The cases law goes on to hold the constitution and its protections
do not apply under Art IV within conquered areas and only privileges
granted by congress through statute are allowed. The holding in _Torres v._
_Puerto Rico, 442 US 465_, demonstrates that the citizens of Puerto Rico
actually have been granted more protections and privileges than the People
in Nevada with respect to the 90% public lands area in Nevada. Congress
has yet to created a statutory privilege for the protection of free speech
while on public lands. Remember, there are no limitations on the United
States or its agents. _Order @ pg5._

7. The judge ruled that I have no constitutional rights, no vested water
rights or right to the beneficial use of the forage rights under Nevada
Law. I must also remove my livestock no later than November 30, 1998 or be
fined a trespass fee of $200 per day per cow on the range after the
deadline. In addition, the United States wants hundreds of thousands of
dollars for what they allege are damages I have caused to the range. The
grazing permit system in conjunction with Nevada Water Law that worked well
for so many years was abolished with that one agency decision. Once I am
gone, there will no longer be developed water on the range. Not even for
the Desert Tortoise.

8. The United States, its agents and the federal judiciary hold there are no
limitations on the agencies when they usurp Nevada Law and our rights on
the public lands. No agency or court in the land has the authority to
impose such an unlimited government within our Nation. Nevada: an admitted
state or conquered territory? This ruling is nothing more than fiat law
that can only be enforced through illegal actions of government agents.
_Therefore I have no intention of removing my livestock from the range by_
_November 30th_. I lodged a proper defense through a motion to dismiss based
on the case law that this court has no jurisdiction over Art IV matters.
To proceed the court created for itself a _hypothetical jurisdiction_. I am
appealing the decision.

9. The State of Nevada being an admitted state of the union, its political
subdivisions and elected and non-elected officials therein, have a duty to
protect me, my family and my rights from this usurpation and emergency.
This obligation is ordered within each and every one of their Oaths of
Office to uphold and defend the constitution. The federal judge has ruled
I am stripped of the constitution and to be ruled by an unlimited power.
The 14th Amendment to the constitution guarantees me protection from such
oppression and orders the State of Nevada to secure this protection for me
and my property.

10. I have been a rancher and steward of the range in this area for many more
years than there has been a BLM. If I were so dangerous and destructive
for the range how have I been able to continue in the ranching business
producing livestock for all these years as my heirs before me?

2

11. I fear that my stand is an endangerment to my life and the lives of my family members and will cause the destruction of my property rights by illegal acts of agents of the United States. They have often attempted to paint me as a violent person when all I have done is stand up for my property and rights. This fight today is no different than the civil rights days when Rosa Parks defied illegal local law and took her rightful seat in the front of the bus. I have to take that same front seat and stand for my rights here today. I have always conducted myself in a professional manner during this battle with words on paper. I take issue with anyone who would try to paint me as some wacko extremist. I do not advocate violence and only want a legal and peaceful conclusion to this issue and my rights protected. Either I have rights or don't have rights. There can be no in between on this matter or have we gone completely over the edge and no longer have a Republic under the Rule of Law. The federal courts have ruled there is no Rule of Law and no limitations of the federal government here in Nevada. This is the emergency the above Nevada officials have to remedy. If the above Nevada officials can not bring forth remedy, then what is their purpose, why have such official positions? All that is then needed are federal regions with federal agents possessing unlimited power within those conquered areas.

12. Therefore, demand is hereby made to the above Nevada officials to enforce their Oaths of Office and the constitutional republican form of government guaranteed me and my family. In addition, demand is hereby made that the above Nevada officials intervene and secure my 14th Amendment rights guaranteed in the constitution and prevent an emergency which has the potential of causing the loss of me and my family's life, liberty and property.

Note: With this unlimited power, federal agencies could prevent all forms of access on the public lands with the stroke of a bureaucrat's pen. No more water transmitted across public lands for small towns; electric, gas television cable and telephone transmission lines ordered removed, state and county roads ordered closed. All forms of recreation could eventually be abolished. Explain how this could not happen under an unlimited power in the hands of government agents. This is why I have to take the stand I am taking and raise the red flag on the severity of the situation. The 1st Amendment guarantees me the right to redress my government. That is what I am doing.

Respectfully submitted,

*Cliven D. Bundy*

cc: PRESS

3

TOTAL P.01

Ex. 2 - Rugwell Dec. Att. G - Page 3 of 3

# ATTACHMENT H

**DRAFT MINUTES - videotape of the meeting is available for viewing at ndow.org.**
Nevada Board of Wildlife Commissioners' Meeting
Clark County Government Commission Chambers
500 S. Grand Central Parkway
Las Vegas, NV  89155
Final Agenda

Friday, February 4, 2011 – 10:30 a.m.

1   Call to Order, Pledge of Allegiance, Introduction and Roll Call of  County Advisory Board
    Members to Manage Wildlife (CABMW) – Chairman Raine

2   Presentation of the Wayne E. Kirch Wildlife Conservation Award – Chairman Raine

3   Approval of Agenda – Action
    The Commission will review the agenda and may remove items from consideration or
    adjust  in the order in which they appear on the agenda.

4   Member Items/Announcements

5   County Advisory Boards to Manage Wildlife (CABMW) Member Items CABMW members may
    present emergent items. No action may be taken by the Commission. Any item requiring
    Commission action may be scheduled on a future Commission agenda.

6   Public Comment Period -

    | Note: Public comment will also be limited to three minutes per speaker on each individual agenda item. |
    |---|

7   Approval of Minutes – Action
    Commission minutes from the Dec. 3 and 4, 2010, meeting.

8   Big Game Division Computer Model and Recommendation Process Report – Big Game   Division
    Chief Larry Gilbertson and Big Game Biologist Mike Cox – Informational

    A    Big Game Division Computer Model and Recommendation Process –
         Chairman Raine - Action
         The Commission may discuss and request information concerning the
         Department's computer model and recommendation process.

9   Wildlife Damage Management Fiscal Year 2011 Plan Report – Chief of Game Larry
    Gilbertson – Informational

    A    Wildlife Damage Management Committee Report – Commissioner
         Vogler – Informational
         The Commission will hear a report from the Wildlife Damage Management
         Committee.

    B    Wildlife Damage Management Fiscal Year 2011 Plan – Commissioner
         Vogler - Action
         The Commission will discuss and provide guidance to the Department
         concerning development and information provided in the 2011 and future
         Wildlife Damage Management plans.

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

10    Reports – Informational

A    Wolf Regulation Status Update – Chief of Game Larry Gilbertson

B    Wildlife Heritage Trust Fund Principal and Interest Fiscal Year 2012 – Deputy Director Patrick Cates

C    2011 Legislative Session Update – Management Analyst III Kim Jolly

11    Clark County Road Access – Commissioner Shrum, Chief of Habitat Elmer Bull and Bureau of Land Management Representative (BLM) - Action
The Commission will hear a report on the Bureau of Land Management's designated routes, restricted grazing and desert tortoise management in Clark County and may draft letters, resolutions and or policy, concerning any or all of these items.

2 p.m. Agenda Item #12

12    Commission Regulation 11- 07, Black Bear Hunt – Chief of Game Larry Gilbertson and Big Game Biologist Carl Lackey – Action
The Commission will consider adoption of recommendations to the 2011 - 2012 black bear hunt seasons, dates and quotas, including limits, hunting hours, special hunt eligibility, animal gender, and physical characteristics, and legal weapon requirements and manner of hunting.

13    Administrative Procedures, Regulations and Policy (APRC) Committee Report and Recommendations – Commissioner Lent – Action
The Commission will be asked to take action on the APRC Committee's recommendations for changes to Heritage regulations.

14    Report from Feral Horse Committee, Horse Monument and Letters and/or Resolutions – Committee Chairman Mike Stremler - Action

    A    The Commission may consider approving a draft letter to the State Water Engineer in reference to the issue of giving water rights meant for wildlife to wild horses – Mike Stremler, chair – Action

    B    The Commission will discuss the Pickens Horse Monument in Eastern Nevada, may provide guidance to the Department on the matter and may approve, modify, create, or deny a resolution and/or letter – Chairman Raine – Action

15    Correspondence – Chairman Raine – Informational
The Commission will review and may discuss correspondence sent or received by the Commission since the last regular meeting and may provide copies for the exhibit file (Commissioners may provide hard copies of their correspondence for the written record). Correspondence sent or received by Acting Secretary Mayer will also be discussed.

Saturday, February 5, 2011 – 8:30 a.m.

16    Call to Order, Pledge of Allegiance, Introduction and Roll Call of County Advisory Board Members to Manage Wildlife (CABMW) – Chairman Raine

17    Member Items/Announcements

2

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

18    Public Comment Period

Note: Public comment will also be limited to three minutes per speaker on each individual agenda item.

19    CABMW Budget Adjustments Fiscal Year 2011 – Deputy Director Patrick Cates - Action
      The Commission will review CABMW budget status reports and may make adjustments to
      CABMW budgets for Fiscal Year 2011.

20    Management Bull Elk Hunt and Seasons – Action – Chairman Raine
      The Department will provide a report and recommendations to the Commission on "management
      bull elk seasons" as described in a report from Cory Lytle of the Lincoln CABMW, and the
      Commission will discuss options for possible development of regulation changes for
      "management bull" elk seasons: Options to set all cow elk seasons after the bull seasons; convert
      all muzzleloader bull seasons into "management bull seasons"; convert all archery bull seasons
      to "management bull seasons"; create new any legal weapon "management bull seasons"; and no
      management bull seasons.

21    Nevada Waterfowl Hunt Zone and Swan Hunt Area Changes – Game Division Staff
      Biologist Russell Woolstenhulme – Action
      The Commission will hear options for the addition of a new waterfowl hunt zone for Nevada and
      an expanded hunt area for tundra swan. The Commission may accept   these   changes   and
      initiate action by the Department to pursue these changes with the Pacific Flyway Council.

      Commission Regulations – Action

22    Commission Regulation 11 – 03, Big Game Seasons 2011- 2012 – Big Game    Biologists  Mike
      Cox and Tony Wasley – Action
      The Commission will consider adoption of the 2011 and 2012 hunting seasons and dates for
      mule deer, pronghorn antelope, elk, bighorn sheep, and mountain goat,  including limits, hunting
      hours, special hunt eligibility, animal gender, physical   characteristics   and   legal   weapon
      requirements, hunt boundary restrictions, and legal weapon requirements, emergency
      depredation hunt structure and statewide quotas, the 2011 – 2012 nonresident restricted deer tag
      quotas and seasons, and dates and times for indoctrination courses. Note: Support material will
      be sent under separate cover.

23    Commission Regulation 11 – 04, Big Game Season Application Eligibility, Deadline and
      Remaining Tag Regulations 2011 - 2012 – Program Officer III Maureen Hullinger – Action
      The Commission will consider adoption of the 2011 - 2012 big game tag draw application
      eligibility, deadline and return card questionnaire information including Restricted Nonresident
      Guided Deer Hunt draw application deadline and return card questionnaire information.

24    Commission Regulation 11 – 05, Silver State Tag and Partnership in Wildlife Season and
      Quotas 2011 – Big Game Biologist Mike Cox and Program Officer III Maureen Hullinger –
      Action
      The Commission will consider the adoption of the 2011 Silver State Tag and Partnership in
      Wildlife hunt species, seasons and quotas. Note: Support material sent separately.

25    Commission Regulation 11 – 06, Heritage Tags, Silver State Tag and Partnership in Wildlife
      Season and Quotas 2012 - Program Officer III Maureen Hullinger and Big Game Biologist
      Mike Cox – Action
      The Commission will consider the adoption of the 2012 Heritage Tag, Silver State Tag and
      Partnership in Wildlife hunt species, seasons and quotas.

3

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

26    Commission Regulation 11- 08, Mountain Lion Seasons 2011- 2012 and 2012 - 2013 –  Staff
      Biologist Russell Woolstenhulme – Action
      The Commission will consider adoption of recommendations to the 2011-2012 and 2012 – 2013
      mountain lion seasons, dates, and harvest limits, including limits, hunting hours, animal gender,
      physical characteristics, hunt boundary restrictions, legal weapon requirements, method of take
      and manner of hunting.

27    Findings of Mule Deer Restoration Committee - Chairman Raine - Action
      The Commission will have a second discussion of the report from the Mule Deer Restoration
      Committee. The Commission will be asked to accept the findings of the Mule Deer Restoration
      Committee and adopt some or all of them as findings and recommendations of the Nevada Board
      of Wildlife Commissioners.

      Commission Regulations – Action

28    Commission Regulation 09 – 09, Amendment #1 – Fisheries Biologist Jon Sjoberg – Action
      The Commission will consider closure of a water(s) within the Clark County Wetlands in Las
      Vegas Wash, Clark County and a name change for the Fuji Park Pond in Carson City to the Baily
      Fishing Pond.

29    Reports - Informational

      A     Western Association of Fish and Wildlife Agencies (WAFWA) 2011Mid-Winter
            Conference Report – Commissioner Capurro

      B     Elk Damage and Incentive Committee Report – Commissioner Vogler

      C     Gifts, Grants, Donations, and Bequests – Deputy Director Cates

      D     Litigation Report – Deputy Attorney General David Newton

      E     Department Activities/Leadership Team Notes – Acting Secretary Ken Mayer

30    Additional Application Hunt System Report Format – Chief of Operations Bob Haughian -
      Action
      The Commission may endorse or deny a request made previously at the December 2010
      Commission meeting from Commissioner Cavin to introduce an additional report format   to
      publicly display a list of successful tag applicants by hunt unit on the huntnevada.com website.

31    Nevada Department of Wildlife Director Selection/Recruitment Process – Chairman Raine –
      Informational
      In accordance with NRS 501.333 the Commission will review and discuss the selection process
      for recommending a new Director for the Nevada Department of Wildlife.

32    Future Commission Meeting – Acting Director Ken Mayer – Action
      The next Commission meeting is scheduled for March 11 and 12, 2011, in Reno; and the
      Commission will review potential agenda items for the meeting and the biennial County Advisory
      Board to Manage Wildlife Workshop. The Chairman may designate and adjust committee
      assignments as necessary. The Acting Secretary of the Commission will report on the status of
      the requested joint meeting with the Utah Commission in 2011.

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

### Nevada Board of Wildlife Commissioners present for two day meeting:

Chairman Scott Raine  Vice Chairman Gerald Lent  Commissioner Daryl E. Capurro
Commissioner Tom Cavin  Commissioner Howell  Commissioner Michael McBeath
Commissioner Hal Shrum  Commissioner Hank Vogler  Commissioner Grant Wallace

Secretary/Director Kenneth E. Mayer
Suzanne Scourby, Recording Secretary  Robert Whitney, Deputy Attorney General
David Newton, Deputy Attorney General

### Nevada Department of Wildlife personnel present:

Deputy Director Rich Haskins  Deputy Director Patrick Cates
Chief of Game Larry Gilbertson  Chief Game Warden Rob Buonamici
Program Officer III Maureen Hullinger  Big Game Biologist Carl Lackey
Supervising Fishers Biologist Jon Sjoberg  Administrative Assistant IV Kathleen Teligades
Administrative Assistant III Jamie Wise  Big Game Biologist Mike Cox
Supervising Big Game Biologist Ken Gray  Big Game Biologist Tony Wasley
Big Game Biologist Russell Woolstenhulme  Management Analyst III Kim Jolly
Acting Chief of Conservation Chief John McKay  Biologist Cris Tomlinson
Big Game Biologist Patrick Cummings  Big Game Biologist Mike Scott

### Others in Attendance/Two Day Meeting:

Paul R. Dixon, Clark CABMW  Keith Rogers, LV Review-Journal
Gil Yanuck, Carson CABMW  Eric Scheetz, Douglas CABMW
Glenn Bunch, Mineral CABMW  Ken Wellington, Elko CABMW
Paul Harris, Clark CABMW  Ray Sawyer, White Pine CABMW
Clint Bentley, self  Cindy Alexander, self
Cory Lytle, Lincoln CABMW  Lee Graves, Lyon CABMW
Joe Crim, Pershing CABMW  Mary Jo Rugwell, Bureau of Land Management (BLM)
Carolyn Running, BLM  Gayle Marrs-Smith, BLM
Mary JoErika Schumacher, BLM  Bol Ross, BLM
Shanna Dooman, BLM  Jessie Stegmer, BLM
Judi Carson, Coalition for Nevada's Wildlife  Brett Jefferson, Nevada Bighorns Unlimited (NBU)
Chris Steven, Southern Nevada Water Authority  Jenny Ramirez, U.S. Forest Service
Walt Gardner, self  Cliven Bundy, rancher/speaker
Carol Bundy, rancher  Dane Bradfield, Lincoln CABMW
Jennifer McCarty, self  Catherine Matz, self
John Hiatt, Red Rock Audubon Society  Amy Ogden, People Ethical Treatment of Animals PETA
Randy Ogden, PETA  Karen Layne, Las Vegas Valley Humane Society
Gina Greisen, NV Voters for Animals  Heather Spaniol, self
Billy Howard, NoBearHuntNV.org  Linda Faso, Humane Society of the U.S.
Debora Toro, self  Pamela Coburn, LV Valley Humane Society
Nancy Salazar, NV Political Action for Animals  Mac Kasraian, self
Stacia Newman, NV Political Action for Animals  Tracy Hammond, self
Megan Sewell, Humane Society of the U.S.  Kirsten Comm (illegible), BLM
Hillerie Patton, BLM  Chris Schwamberger, NoBearHuntNV.org
Martin Scholl, self  Steve Hemp, Humboldt CABMW
Monty Martin, Systems Consultants  Don Sefton, Systems Consultants
Carmen Rhoda, none  Jelindo Tiberti, self
Cindy MacDonald, resident  Kensen Lee, self
Kevin Strozzi, Nye CABMW  Jason Cork, self
Micki Jefferson, self  Kathryn Bricker, NoBearHuntNV.org
Heather Lunsford, NoBearHuntNV.org  Robin Picardo, self and animals

5

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

11       Clark County Road Access – Commissioner Shrum, Chief of Habitat Elmer Bull and
         Bureau of Land Management (BLM) Representative

Commissioner Shrum said he has spent much time in Nevada and in the past years has
been running into road closed signs and did research and he ended up at the BLM office
and picked up books and spent time over there with BLM District Manager Mary Jo
Rugwell who is here along with BLM staff. He also invited representatives from Clark
County sheriff's office, and he prepared a small pamphlet (exhibit file) of the issues. To
balance this out he went to Bunkerville, Nevada, and met with Cliven Bundy and family,
and he is present today as well. He read the pamphlet (exhibit file) that he prepared for
this agenda item along with questions for Ms. Rugwell.

BLM District Manager Mary Jo Rugwell addressed the questions from Commissioner
Shrum's pamphlet and said authority to designate or close roads and primary legal
authority is in Federal Land Policy and Management (FLPMA) Act of 1976, BLM is part of
executive branch of government and their responsibility is to implement laws Congress
passes and when FLPMA passed, BLM had to promulgate regulations to implement laws
and manage and administer BLM public lands. Second question, who decides what
roads to close, BLM has the responsibility to make the final decision but with public
input. Clark County road designations were implementation action of Resource
Management Plan (RMP) completed in 1998 and plan took over three years to develop
with input from over 400 stakeholders and rural community assisted with documenting
the roads. BLM had four public meetings and a 50 day public comment period and after
the decision, the public is allowed another 30 days to appeal and BLM did not receive
any appeals on road decision and then their job was to implement. Important to note
that of over 906 miles of roads analyzed that BLM left 90 percent of those roads open,
did not close anywhere near the majority of roads. Next question was how long will plan
stay in effect, road designations in effect as long as RMP in effect. Agency continues
with help of partners to monitor roads and effect on resources and changes to road
decisions can be made through analysis and another public process. Another question
was who decides when desert tortoise recovered, and U.S. Fish and Wildlife Service
makes that decision. The criteria for delisting tortoise, is outlined in the recovery plan
which was developed when the tortoise was listed. Other question, when ranchers leave
who maintains water – springs, seeps, and the answer is the BLM does in conjunction
with NDOW, Nature Conservancy, the folks who have water rights. Another question is
when travelling on a road and you are at an intersection and take wrong road that is
closed and get citation, what happens. She said when BLM puts sign up for designated
road through planning process we give people time to get used to closure before citing
them. The Gold Butte area is signed and folks vandalize signs which costs taxpayers, and
results in confusing recreating people, and if people knowingly use closed roads they are
cited. Working hard to insure signage is there for the public. Who has the authority in
Gold Butte, sheriff or BLM, she said the answer depends on the situation or crime, BLM
has few law enforcement rangers and are happy to help Clark County Sheriff's Office.

16

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

The violation of any federal regulation is under BLM rangers under authority of FLPMA, some examples are theft of government property, vandalism of a sign and off-road travel in a closed area. A Memorandum of Understanding in place with Las Vegas metro for search and rescue in Wilderness Area as BLM does not have that capability. Prior to the meeting a copy of the fact sheet and Gold Butte map was provided to the Commission and that information will be on the website after refinement to the map. She said that concluded the answers to the written questions from Commissioner Shrum.

Commissioner Shrum introduced Cliven Bundy who is a rancher from Bunkerville. Commissioner Shrum said there is contention between the ranching families and BLM up there and he wants people to be informed of both sides of the question.

Mr. Cliven Bundy said he is a rancher and co-partners with the resource and has great respect for the Commission. He said he is a god fearing man and believes we live in a country of choice and the resources provided are for man's use and we need to take care of them. He showed the group a slide on jurisdiction of the "proper form of government" which started with "We the People" and he reviewed the forms of government starting with 13 original colonies which formed the U.S. Constitution, 13 sovereign states, state's independence and that Nevada became a state in 1864 with the state divided up into counties. He said when talking about public lands we are talking about the public lands of Clark County that is land belonging to the people. County Commission and sheriff are government closest to the people, and when we started we were after protection of life, liberty and property, and created Constitution. We now have sheriffs paid to do that and his question is who has the authority over the land, jurisdiction and sovereignty. Federal government jurisdiction challenged and "We the People" formed proper form of government and that is not the proper authority we have now as the people are not taking care of the land.

Commissioner Shrum asked if Mr. Bundy can explain how this has affected him with wilderness designations and other items.

Mr. Bundy said he is well known for firing the BLM about 15 – 20 years ago as they don't have jurisdiction to manage his ranch in Clark County and all the 57 ranchers of Clark County are gone, he is the only one with viable livestock business. He learned BLM is only manager and when he quit signing contracts he released them from their assistance and from that time on has been able to manage and claim rights to forage, the water, the access, and range improvements. He said he claims rights to hunt, fish, and camp and enjoy public lands in Nevada.

Commissioner Shrum asked what effect a Wilderness designation would have on his ranch.

17

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

Mr. Bundy said he has presumptive rights created through beneficial use and if they designate area as National Conservation Area onto this public land, and or Wilderness, that will make it hard for him to run his cattle and harder for outdoor recreationists and he foresees that they will create a byway that you just stay on and that is where we are headed. This area in Southern Nevada that has not been designated yet and is the last piece of free land in Southern Nevada and we are about to lose our freedom there.

Public Comment on Agenda Item #11 –

Ken Wellington, Elko CABMW, said he is representing himself on this issue and that Mr. Bundy needs to move to Elko County, as everyone carries a copy of the Constitution in their pocket in Elko County. He said in Elko CABMW members are active on the Resource Management Commission and they get people involved, and the forms that he provided to the Commission's recording secretary are BLM's documents such as Environmental Assessment's and proposed closures, and they are providing their input into the plans and the Commission could comment if public comment period still open.

Commissioner McBeath said 1998 RMP was mentioned earlier which is currently in process of being revised and they are in process of putting together plan and noted road access portion of that plan and he would ask BLM staff the effect on sportsmen and NDOW, and secondly on Jan. 28 he saw in the Federal Register what appears to be a transportation plan for Clark County, and is similar to what we have dealt with up north. He said it is absolutely critical that access be maintained for sportsmen.

Ms. Rugwell said her agency is in early stages of revising the RMP and the reason for the revision is because of energy concerns in Southern Nevada and some decisions that were conflicting in old plan that needed to be resolved. Local governments are offered the opportunity to participate as cooperators and they are getting Memorandum of Understandings signed with local governments right now and the county will be very involved. RMP for Southern Nevada District is beginning and these are two efforts that are crucial for public engagement and want to hear from the public to insure this is what the public wants before the process gets too far along.

Commissioner McBeath said the Clark CABMW should assume a role such as Elko CABMW has done to weigh in and make sure wildlife stakeholder interests are heard on access issues in Clark County.

Commissioner Vogler asked Mr. Bundy if he had been told that he could not run livestock due to the desert tortoise listing.

Mr. Bundy said that is correct and there a many desert tortoises and he has data showing surveys for Kern River pipeline done by the bureaus and what happened there

18

NBWC Las Vegas Meeting
Feb. 4 and 5, 2011

is where there are cattle there are five to seven tortoises in a strip. There are higher tortoise numbers in grazing areas that areas where there is no livestock grazing.

**COMMISSIONER SHRUM MOVED TO DRAFT A RESOLUTION TO SEND TO ALL CONGRESSIONAL REPRESENTATIVES, INTERIOR SECRETARY KEN SALAZAR, CLARK COMMISSION COUNTY COMMISSIONERS, AND APPROPRIATE PARTIES TO REMOVE THE GOLD BUTTE AREA FROM CONSIDERATION NOW OR ANY TIME IN THE FUTURE AS WILDERNESS AREA, CONSERVATORY OR ONE OF THOSE DESIGNATIONS. SUCH A DESIGNATION WOULD HAVE A NEGATIVE IMPACT ON WILDLIFE AND WOULD DENY ACCESS FOR DISABLED, ELDERLY, AND FURTHERMORE DESIGNATION NEGATIVE IMPACT ON DESERT FLORA AND WATER RESOURCE DISTRIBUTION SYSTEMS WHICH ALL WILDLIFE DEPEND. COMMISSIONER HOWELL SECONDED THE MOTION.**

Commissioner Shrum offered to draft the resolution for Chairman Raine's signature.

Commissioner Capurro said his concern is this should be placed on a future agenda for full discussion and have staff develop a resolution along lines mentioned, under circumstances would recommend action for a future agenda and follow-up.

**COMMISSIONERS IN FAVOR OF THE MOTION: COMMISSIONER LENT, HOWELL, SHRUM, AND VOGLER. COMMISSIONERS OPPOSED: CAPURRO, CAPURRO, WALLACE, AND MCBEATH. CHAIRMAN RAINE VOTED IN FAOVR OF THE MOTION TO BREAK THE 4-4 TIE. MOTION PASSED 5 – 4 WITH CHAIRMAN RAINE'S VOTE.**

**MOTION AND A SECOND TO CONTINUE WITH #8 GO TO #12 THEN PICK UP #9 AND #10 AT THE END. MOTION PASSED 8 – 0.**

8    Big Game Division Computer Model and Recommendation Process Report – Big Game Division Chief Larry Gilbertson and Big Game Biologist Mike Cox – Informational

Chief of Game Gilbertson said the model was shown to the Commission a few years ago when there was intense interest in the elk population relative to NDOW's modeling. He said since that time there are new Commissioners and CABMW members and the Department is pleased to present this item. He provided background on evolution of the modeling process: Before 1975 not as much need to conduct deer population estimates due to the hunt structure and in the old days the population estimates used were simply harvest representing a percentage of the population. He said in 1975 Nevada switched to total quotas for the entire state, and at that point the Department either needed population estimates for real numbers to use to calculate quotas commensurate with the ability of the population to provide that harvest, or one method that may be used still is to look at long-term average harvest. In the mid-1970s we could have looked at average harvest and applied hunter success and could have started that way. Instead the Department decided as we collect data and implement helicopter surveys that we

19

# ATTACHMENT I



United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Southern Nevada District Office
4701 N. Torrey Pines Drive
Las Vegas, NV  89130
http://www.blm.gov/nv/st/en/fo/lvfo.1.html

**JAN 2 1 2011**

In Reply Refer To:
Trespass Number NV–050–5–675
4150 (NVS0052)

CERTIFIED MAIL 7009 2820 0001 6804 3765 – RETURN RECEIPT REQUESTED

Cliven D. Bundy
P.O. Box 7175
Bunkerville, Nevada 89007

Dear Mr. Bundy:

On February 17, 1994, a final decision was issued to you canceling your grazing preference in its entirety. The decision also included an order to remove trespass livestock and a demand for payment of trespass damages. This decision found you knowingly, willfully, and repeatedly grazing livestock without authorization on the Bunkerville Allotment. On November 4, 1998, the United States District Court of Nevada denied your Motion to Dismiss, and ordered you to remove your livestock from the Bunkerville Allotment on or before November 30, 1998, and ordered that you are permanently enjoined from grazing livestock within the Bunkerville Allotment. The court further ordered that the United States shall be entitled to trespass damages in the amount of $200.00 per day per head for any livestock belonging to you remaining on the Bunkerville Allotment after November 30, 1998.

An article published in Las Vegas City Life on December 2, 2010, demonstrates that you are aware of your continued willful trespass. This letter serves to remind you that in addition to the above court order, you are violating the law(s) specified below and the regulation(s) approved by the Secretary of the Interior pursuant to the authority vested by said law.

Taylor Grazing Act of June 8, 1934, as amended: Section 2, 48 Stat, 1270; 43 USC 315a.

Federal Land Policy and Management Act, as amended, 43 USC 1752.

You are also in violation of the following regulation(s):

43 CFR 4140.1 (b) (1)
(1) Allowing livestock on or driving livestock across these lands:
    (i)  Without a permit, lease or other grazing use authorization.

Violations, if continuing, must stop immediately and fees must be reconciled.

2

This letter is to provide you notice that the Bureau of Land Management is evaluating and calculating trespass damages according to the court order referenced above, and we will be notifying you of those damages.  Failure to resolve this ongoing trespass will result in further action to protect the interests of the United States.

Please contact Bob Ross, Field Manager, Las Vegas Field Office, at (702) 515-5199 or bob_ross@blm.gov with comments or questions.

Sincerely,

Mel M. Meier
Associate District Manager

# ATTACHMENT J

Local News :: Las Vegas CityLife                                                                    Page 1 of 4



# Endangered species

**Clark County's last cowboy squares off against the federal government over the fate of his cattle ranch and the desert tortoise**

by AMY KINGSLEY : AKINGSLEY@LVCITYLIFE.COM

BUNKERVILLE -- The cowboy is having a hard time gathering his herd. Cliven Bundy, a tall man in jeans, spurs that jangle when he walks, a button down shirt and legs slightly bowed from decades of sitting on horses, points out a line of hoof prints. It's the best he can do.

"As soon as you get the water, you see the wildlife," he says.

As if on cue, a covey of quail squirts out of a bush near a watering trough. In the distance, a cottontail skitters up the road. If only his cattle were as cooperative. A few hours out on the range, and only four head have graced us with a flash of their presence. As soon as they spotted the truck, they trotted into the hills.

That glimpse happened near another of Bundy's range improvements -- tanks and troughs that collect the spring water and deliver it to his beef. He's got them all over the Virgin River Valley, the Toquop and Key West ranges and up the side of Virgin Mountain.

This particular improvement sits in a lovely crease between brown hills. It consists of a concrete cap where the water emerges, and a giant tank with a small spigot where the water comes out in a constant crystal stream.

Bundy's ranching operation brings him out here all the time. He chases leaks in the pipe and generally minds the tank and trough, which is capped in metal mesh that keeps baby quail from tumbling in and drowning. Then, when he's done, he turns to his extracurricular project.

Bundy has been trying to preserve the original water tank, a concrete box no bigger than a bathtub. The original ranchers, who date to the 1860s, scratched their brands into the box. But gradually, time broke it apart and scattered the symbols across the desert floor. Slowly, meticulously, Bundy has been picking them up and putting them back together -- piecing together the puzzle of the history out here.

"Here is one of the artifacts of the cowboy," he says. "It's an old water trough, and you can see the brands marked into the concrete. These are from people who ran cattle with my grandpa."

It's a vestige of a forgotten economy, Bundy says. An industry that used to bring $100,000 in income every week to this community has now been virtually eliminated. And instead of honoring the area's cattle ranching history, the county and the federal government want to obliterate it, Bundy says. The BLM has three grazing authorizations in Clark County, but it's unclear whether any of them are active.

"There used to be 52 cattle ranchers in Clark County," Bundy says. "Then it dropped to a dozen or less. And now it's just me."


PHOTO: MAUREEN ADAMO
Cliven Bundy is the only cattle runner left in Clark County.


PHOTO: MAUREEN ADAMO
Bundy has been embroiled in a silent battle of wills with BLM over his cattle.

The old water tank dates back to an era when Bundy's grandfather and a dozen of his neighbors ran cattle up and down the hillsides. Now, Bundy is the only one left. He's the lone holdout from an era when cattle ranching dominated the Nevada economy -- and he's not even supposed to be here.

### Hardy traditions

For the last 17 years, Bundy has been illegally grazing his cattle on land owned by the Bureau of Land Management. It's an open secret on these hills. The bureau keeps a running log of all Bundy cattle spotted out on the range. The U.S. Park Service knows who to call when a calf turns up stuck in the mud near Lake Mead.

Every so often, a ranger may leave a message on his answering machine, or send a notice of violation, but Bundy never responds, and nothing ever happens. His neighbors have all gotten out of the business. But the outlaw Bundy continues to graze his cattle on the range, in open violation of federal statutes.

"I fired the BLM," he said. "I decided I did not need their management any more, and I wasn't going to pay them any more. I was paying them to manage my ranch, and they were actually trying to break me."

Bundy's silent protest of the BLM began in 1993, a few years after the U.S. Fish and Wildlife Service emergency listed the desert tortoise as an endangered species. That act drastically changed the relationship between federal land managers and cattle ranchers like Bundy.

The agency identified several threats to tortoise habitat. Urban development topped the list, and cattle ranching came in somewhere near the bottom. But growth seemed unstoppable, and cattle ranching was already on its way out. So Clark County adopted a desert conservation plan that ceded vast tracts of environmentally sensitive land in the southern part of the county to developers, in exchange for the elimination of cattle ranching in the areas near Bunkerville.

In December 1998, more than five years after Bundy stopped paying his grazing fees, Clark County bought the remaining grazing rights in the Bunkerville Allotment for $375,000 and retired them for the benefit of the desert tortoise. Bundy was not included in the negotiations.

Now, it is an area of critical environmental concern, off-limits to ranchers, off-roaders and miners. But Bundy's cattle still roam the hillsides, grazing on vegetation and occasionally making a brief stop at one of his watering stations.

Bundy will tell you his grazing is good for the land. His water tanks attract not only quail, but also chucker birds and deer. Conservationists insist the grazing isn't good for tortoise populations. Cattle and tortoises consume the same types of food, foraging on the desert grasses, chaparral and burrow sage that cling to the mountainsides.

"There is a lot of science that says there is a lot of competition between cattle and tortoises," said Rob Mrowka, conservation advocate for the Center for Biological Diversity. "The U.S. Fish and Wildlife Service has taken steps to reduce that conflict and that threat to the tortoise."

The courts have sided with Mrowka and the government. In the late 1990s, the U.S. District Court and the Federal Court of Appeals issued permanent injunctions against Bundy, and ordered him to pay damages in excess of $150,000. Neither decision had any affect on his operation. Bundy never paid his fines, and he never pulled his cattle off the land.

In a handful of memos, officials from the BLM expressed concern a confrontation with Bundy could turn into a violent repeat of Ruby Ridge. Since then, they've quietly documented the ongoing trespass, but done little to stop it.

Despite volumes of documentation and the court decisions that have gone against Bundy, the bureau would have to start from scratch if it wanted to do anything about Bundy's cattle, said Las Vegas District Manager Mary Jo Rugwell. She would like to gather a coalition of affected parties, including the county, state brand inspector, the park service, the U.S. Attorney's Office and private landholders in the area around Bunkerville.

"You would have to get all of the stakeholders together," Rugwell said. "Because it's occurring on a lot of other jurisdictions as well. It's going to take a while to do this."

It will take a lot of political courage. The cattle grazing tradition that Bundy represents still carries a lot of cultural weight in some parts of Southern Nevada. Although he voted to buy out and retire other grazing permits in Bunkerville, Clark County Commissioner Tom Collins has publicly defended Bundy, and the county office in charge of desert conservation defers to the BLM on trespass issues.

But the simmering conflict between Bundy and the BLM is poised to flare again. If the effort to turn Gold Butte into a National Conservation Area is successful, the agency will have to address the trespass issue. Bundy's cattle regularly wander into Gold Butte, and the boundary would extend to the area surrounding his ranch.

### Strong roots

The Bundy family settled these parts in 1877. They were Mormon pioneers from Salt Lake City who accepted a mission to move south, first to Kolob, Utah, then the Arizona Strip before settling in Bunkerville, on a rolling plot of land

between the mountains and the Virgin River.

They immediately set about making improvements and running cattle on the open range. Cattle ranchers in the West needed more space than their eastern forebears. A cow can get just as much nourishment from the desert as she can from a pasture, but she needs about 100 acres to do it, Bundy said. His family branded the cattle and let them go.

The federal government didn't start regulating cattle ranching until the passage of the Taylor Grazing Act in 1934, which was in response to overgrazing on public lands.

Bundy may have earned a reputation as a foe of the federal government, but he speaks highly of the initial efforts to control grazing. Ranchers were organized into grazing districts, and the fees they paid went right back in to improving the range. Government officers erected fences and divvied up water rights. Most of their actions benefited serious ranchers and drove the two-bit players off the range.

The Bundy family also kept a small farm it operates to this day. Cliven Bundy plants heirloom melons in the fields at the bottom of his ranch. He and his wife also collect and sell local honey, as well as butter from their dairy cows.

Bundy grew up in a family of cattle ranchers, and he got his first cow when he was 5 years old.

"Then I turned around and sold him for two heifer calves, and I was in business," he said.

His herd eventually grew to 1,400 head, but has shrunk to about 500 head in recent years. His cows run wild on the range, foraging on browse and occasionally wandering as far as Lake Mead and Arizona. Bundy has an enormous amount of faith in the notoriously harsh desert land.

"You wouldn't think anything could survive out here," he said. "But they get all the nutrients they need out of the plants that grow out here."

The mother cows teach their babies what to eat. When they're about 10 months old, Bundy gathers them off the range and grain finishes them at his ranch until they are ready for market.

The meat he raises is not technically organic. But it's produced close to the land, without hormones or antibiotics. If it weren't for the tortoise issue, environmentally-minded consumers would probably praise Bundy for the sustainability of his operation. Not to mention the proximity. Steakhouses in Las Vegas regularly source their meat from overseas, moving it by air and sea, which requires a lot of carbon-producing fuel.

"I have always tried to raise them the natural way," he said. "I call it natural because it's not 100 percent organic. The goal is not to manage the cows too much, but instead to manage the water."

The cows aren't his only product. Locally, Bundy is known for his casaba melons, which he keeps in a series of bins near the entrance to his property. Payment is on the honor system. Buyers get three melons for $10, which they deposit in a coffee can near the gate.

Bundy's melons come from seeds that have been passed down for 140 years. When he started growing them with his mother as a boy, they needed twice-weekly watering. Now, he only waters them twice a year. He floods the fields once before he plants the seeds, getting the soil good and moist for the planting. Then he goes along the rows, placing the seeds in the ground and covering them with a hard cap of dry soil. That seals in the moisture. The seeds soak up the water, and send their roots out into the dirt. Like the cattle, the roots need to range far to get the nutrients they need.

The heat and deprivation concentrates the sweet flavor of the fruit. Bundy picks through his vines with a small pocket knife, raises a small casaba and sticks in the knife. He produces a wedge of snow white fruit that's sweeter than anything you'd find at the grocery store.

"We've got no quibble with his melon farming," Mrowka said. "And if he kept all his cattle on his property, it would be fine."

**Last stand**

Bundy has no intention of voluntarily bringing his cattle in from the range. He believes this wilderness is the people's land. That gives him the right to graze his cattle. Others can come in and have picnic or hike if they like. The off-road driving doesn't bother him much, even when it occasionally crosses paths with one of his herds. Public lands should be just that, he said. Clark County is making a grave mistake by supporting the creation of a conservation area at Gold Butte, which would restrict public access to people who can afford to pay a fee.

"If it's the king's forest, the king can make the rules," he said. "If it's the people's forest, we can better protect it and make it productive."

The BLM would like to reach a compromise with Bundy, instead of dragging the matter back through the courts. But it seems unlikely the rancher would willingly sit down with the agency. During the past 20 years, the two parties have fundamentally diverged in their opinions of how the land should be used, with the BLM lurching toward conservation,

and Bundy believing citizens should make constructive use of the land.

Although the BLM sent Bundy notices to remove his range improvements, the cattleman continues to maintain the pipes and tanks that allow him to keep his ranching operation going. Bundy responded to the BLM with a letter that asserted his rights to continue grazing on the land, granted under the 1934 Taylor Grazing Act.

Meanwhile, Mrowka and the Center for Biological Diversity have stepped up their efforts to convince the BLM to do something about the grazing situation. He would like the agency to confiscate the trespass cattle. During the past two years, he's sent several letters to the BLM with documentation of the cattle trespass, and even addressed it at a meeting of the Clark County Commission. Even though he is on the opposite side of the issue, Mrowka ironically identifies the BLM as a common enemy.

"Our fight is not with Cliven; it is with the federal government," he said. "They need to round up the trespass cattle and haul them off the site."

In the 1990s, the BLM worried a confrontation with Bundy could turn violent. In this era of anti-government sentiment, the bigger danger may be its political unpopularity. Even though the county has invested $375,000 to retire grazing rights, it seems to have little stomach for enforcing the ban on Bundy. Collins supports his right to graze. Marci Henson, the county employee in charge of the Desert Conservation Program, said the trespass was a BLM issue.

Forces other than the BLM have been shrinking Bundy's herds in recent years. The drought has taken its toll. During several dry spells, he and his wife have figured the end was near. That's usually when the rain falls, giving them a temporary reprieve. But he can't deny it's getting harder and harder to sustain a working cattle ranch on the withering hills. His cows are resourceful, but not miracle workers. If their food disappears, they will too.

The same drought is probably taking its toll on the desert tortoise. Despite the decline in grazing near Gold Butte, the tortoise population hasn't bounced back. Bundy said he spots about five or six a year -- a huge decrease from the number he saw as a boy, when cattle and sheep crowded the range.

Back in those days, Bundy used to follow his father out on the range, working the cattle and living off the land. He demonstrates his technique for starting a desert fire, dropping a dried yucca plant onto the dirt and topping it with several pieces of wood. He strikes a kitchen match on a small rock and slides it under the kindling. The fire burns fast and hot.

Bundy pulls two small steaks out of a cooler. It's the closest look he's had all day at his cattle. He slides the steaks onto a couple of forked sticks and sets them over the fire, where they drip fat and turn brown.

"I do not break any of Nevada's state laws," Bundy said. "But if you go to the U.S. Code, I guess everything I do is against the law. It's probably illegal to start this fire."

Bundy pulls a plastic bag full of dough from the cooler. It's a sourdough that's been in the family for generations. He pulls off a piece, wraps it around the stick, and thrusts it over the fire. When it's done, he squeezes a glob of honey butter -- made from tamarisk honey and dairy from his cows -- onto the charred bread, which is smoky on the outside and a little doughy inside.

"This is probably the last year we'll have honey," Bundy added.

The non-native tamarisk plants that produce the flowers for local honey have been targeted for elimination because they consume too much water. Bundy said he'll miss the plants, their yellow foliage and sweet honey. He kicks dirt over the last embers of the fire.

"I do good things here," he said. "I create something here. A commodity. An eatable commodity."

*Last updated on Thursday, December 2, 2010 at 12:09 am*