ROGER I. ROOTS, ESQ.
Attorney at Law
Pro Hac Vice*
Rhode Island Bar No. 6752
113 Lake Drive East
Livingston, MT  59047
Tel: (406) 224-3105
Email: rogerroots@msn.com
Attorney for Defendant, Cliven D. Bundy

ROBERT O. KURTH, JR.
Nevada Bar No. 4659
**KURTH LAW OFFICE**
3420 North Buffalo Drive
Las Vegas, NV  89129
Tel: (702) 438-5810
Fax: (702) 459-1585
E-mail: kurthlawoffice@gmail.com
NV Resident Attorney for Defendant,
Cliven D. Bundy

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>CLIVEN D. BUNDY,<br><br>　　　　　　　Defendant. | CASE NO.: 2:98-cv-00531-LRH-VCF<br><br><br>DEFENDANT BUNDY'S MOTION TO REOPEN, SET ASIDE & VACATE ORDERS (ECF No. 55 & ECF No. 56) PURSUANT TO RULE 60(b) (with attached affidavit) |

**EVIDENTIARY HEARING REQUESTED**

**Certification: The following Motion is filed within a reasonable time.[1]**

---

[1] See page 8-9 of this document.

*Application for pro hac vice admission pending 11/13/2017

1    **COMES NOW** the Defendant, Cliven D. Bundy, by and through his counsel, and

2    respectfully files this Rule 60(b) Motion to Reopen, Set Aside & Vacate Orders (ecf no. 55

3    & ecf no. 56) pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, and hereby

4    requests that this Court set aside, amend, modify or vacate the final orders in this case—

5    Civil Action 2:98-cv-00531.  The Defendant incorporates his Memorandum of Points and

6    Authorities in Support of his Motion and states the following:

7

8                            **MEMORANDUM OF POINTS AND AUTHORITIES**

9    **I.        FACTUAL BACKGROUND**

10

11        The Defendant, Cliven D. Bundy (hereinafter "Cliven" or "Defendant" or "Bundy"),

12   age 71, owns and operates the Bundy Cattle Ranch approximately seventy-five miles north

13   of Las Vegas, Nevada.  Cliven and his large family come from a long line of cattle ranchers

14   who have ranched and grazed cattle in the Bunkerville, NV area.  In fact, the Bundy Ranch

15   and its predecessors-in-interest began the operation in the 1870s, predating the existence of

16   the General Land Office (hereinafter "GLO") or the Bureau of Land Management

17   (hereinafter "BLM").

18        Out of fifty-three (53) cattle ranchers that once grazed cows in Clark County, Nevada;

19   nearly all of them have folded and gone out of business due to the oppressive and

20   unconscionable practices and policies of the BLM and the Department of Interior.  To date,

21   Cliven Bundy[2] is the last cattle rancher standing in Clark County, Nevada.

22

23

24   _____

25   [2]     It is important to note that not only is Cliven Bundy the last rancher
     standing in Clark County, Nevada; but he is also presently being held as a pre-
26   trial detainee for the past eighteen months in a Pahrump, Nevada private
     prison with no bail set by the district court in Nevada because it has been
27   determined that Bundy is a future danger to his community while he stands

28

Bundy and his predecessors in interest have built and maintained a number of improvements on the rangeland in question. Pursuant to federal and state law as well as long-established custom and practice, range and water improvements on public ranges are the property of the ranch to which they are associated, and such property rights are grandfathered and run with the land.

## THE 2014 CATTLE IMPOUND OPERATION

Upon information and belief, the District Court's October 8, 2013 order authorizing the United States to "seize and remove to impound" Bundy's cattle was used by the federal government in 2014 to justify the largest infringement of First Amendment rights (by area) in American history. BLM officers limited First Amendment rights in an area of hundreds of thousands of acres to two isolated penned enclosures totaling less than a quarter-acre in size. Officers also cited the order as authorization to close public roadways, close off tens of thousands of acres of land to the public, and falsely arrest a Bundy family member who lawfully parked on a state highway to photograph officers.

Defying county officials, the federal officers chose calving season—the very time when cows and newborn calves are most physically weak and vulnerable—to execute the District Court's order. They orchestrated a para-militarized roundup operation using helicopters to terrify the cattle into stampeding to the point of exhaustion in extreme heat so that the cattle could be captured.

To "seize and remove to impound any of Bundy's cattle that remain" (as authorized by the order), the Bureau of Land Management mobilized over three-hundred (300)

---

trial on (16) counts of federal crimes drafted by the same U.S. Attorney, Nadia Ahmed, that prosecuted him for trespass civilly in 2012, 2013 *infra*.

employees, contractors and other federal agents.   During the operation, BLM and its contractors gathered some four-hundred (400) cattle and confined them inside pens near a sandy desert wash outside Bunkerville, Nevada.  At least forty (40) head of cattle either died from unnatural causes or were shot and killed by BLM employees and contractors working under the direction of BLM.

BLM employees and contractors impermissibly utilized large earth moving equipment to bury voluminous numbers of cattle killed by the BLM through its employees and contractors.   BLM employees further used heavy earth moving equipment to destroy thousands of acres of Bundy's ditches, wells, irrigation lines and other water propelling systems engineered to nourish cattle by the Bundy's and their predecessors in interest for the previous one hundred (100) years.   Several hundred-thousand dollars in range improvements implemented by the Bundy's over the last century were impermissibly destroyed by BLM employees.

Upon information and belief, BLM officers or agents used the order as an excuse to desecrate graves of historic prospectors on the Bunkerville Allotment in April 2014.  In their zeal to harm Bundy and destroy the Bundy Ranch, the BLM wantonly dismantled or ruined infrastructure and improvements solely out of spite or vindictiveness.

Executing officers wore battle armor, bore semi-automatic weapons and deployed undercover informants and operatives throughout the community.   A communications operation was set up to coordinate surveillance of Bundy family members and supporters. Members of the local community found themselves shouted at and threatened by BLM officers throughout the Bunkerville area.

In response, hundreds of citizens journeyed from all over this country to protest the BLM operation. As a direct result of the public protest and national outcry, the BLM halted their cattle gather and—at the apparent direction of the U.S. Attorney's office—immediately withdrew from the area without releasing any of the gathered cattle from pens on or about April 12, 2014. The cattle would have died had not members of the Bundy family released them back onto the range.

## II.   PROCEDURAL BACKGROUND
### A. The Initial Proceeding (1998)

In 1998, an ongoing dispute came to a head between Cliven Bundy and the BLM regarding purported grazing fees the BLM claimed were owed by Cliven Bundy for grazing cattle on public land. As a result of this dispute, the BLM, by and through the U.S. Attorney in the District Court of Nevada, commenced its [first] civil action for failure to pay grazing fees against Cliven Bundy couched as a declaratory and injunctive relief action for civil trespass[3] on March 27, 1998. On November 4, 1998, the District Court issued an order of judgment for the government and against Cliven Bundy. [Case: 531; ECF No. 20] Further, the government filed a motion for damages. [Id. at ECF No 21]. Bundy immediately appealed to the Ninth Circuit and moved the district court to stay its order. [Id. at ECF No 35] Essentially, the district court granted the government's Motion to enforce judgment with modifications [Id at ECF No. 45].

On September 17, 1999, the district court found fifty-one (51) of Bundy's cows were trespassing and ordered 1) Bundy to remove his cattle from the allotment. See ECF No. 19; that 2) Bundy was to pay to the US $45.90 per day for each day his cattle remained on the

---

[3]   Cliven Bundy defended himself *pro se* with no assistance from any attorney in this case as well as in several related cases *infra* prior.

allotment commencing 1/1/99; that 3) Bundy was to pay US $4,123.06 for the expense incurred by the BLM for the 12/15/98 trespass detection flight. [Id at ECF No. 45 & ECF No. 46].

After said order and judgment were entered by the district court in 1999, neither the government, the BLM nor any other federal agency sought further assistance or legal oversight from the district court; nor did they invoke Fed. R. Civ. P 70 [or] employ local law enforcement to collect or otherwise remove the Bundy cattle pursuant to Title 43 U.S.C 1733.

## B. Case No. 2:16-cv-00804 (The "New Trespass Lands" Case)

The 1998 and 1999 orders were never executed or enforced, and the case became dormant, dead and closed after a decade (according to every known test of legal construction). However, on May 14, 2013, *thirteen (13) years after the previous action*, the United States filed yet another civil complaint4 against Cliven Bundy in the same district court. [Case 804; ECF No. 1]. Essentially, the government made the same allegations against Bundy and sought declaratory and injunctive relief again.  This time, however, the government claimed—based on very little evidence—that Bundy was grazing cattle on "new trespass lands" designated as the Lake Mead National Recreation Area.  The government asked the court to declare Cliven Bundy was trespassing; and then asked the district court to order Bundy to remove his cattle from the Gold Butte allotment of the open range in Clark County, Nevada. Id.

Cliven Bundy, appeared *pro se* again in Case 804.  In late 2013, the District Court issued summary judgment against Bundy and Bundy filed an appeal to the Ninth Circuit. After Bundy failed to perfect the appeal, the Ninth Circuit clerk summarily dismissed the appeal.  (Bundy is now seeking to recall the mandate, see Case No. 13-16623 (9th Cir.).)

---

4    See Case No.: 2:12-cv-000804 (hereinafter referred to as "Case 804")

## C. PROCEEDINGS IN 2012

While Bundy was battling the government and BLM in Case 804, the U.S. Attorney's Office filed a _Notice of Related Cases_ in this, 1999 dormant time-barred action on June 6, 2012. However, no further pleadings or notices were filed or any action taken by the government in this Case until nearly one (1) year later.

On April 11, 2013, Terry Petrie, a Department of Justice ("DOJ") attorney filed a _Motion to Enforce Judgment/Injunction_ and attached four (4) exhibits [ECF No. 50]. Then, Mr. Petrie filed approximately fifteen (15) additional exhibits including an affidavit from a BLM Agent named Jesus Navarro approximately one week afterward [ECF No's. 51, 52]. The exhibits appear to be the same exhibits filed in Case 804.

Bundy diligently litigated against the government in both cases _supra_ until May 15, 2013 for Case 804; and until October 9, 2013 for this Case – 531. The district court ruled in favor of the government in both cases; essentially ordering Bundy to remove the cows from the same land where his forefathers and predecessors in interest had been grazing cattle for nearly one hundred fifty (150) years prior.

The government previously obtained a summary judgment in this case, along with a court order on or about October 8 2013 authorizing the United States to "seize and remove to impound" Bundy's cattle on the range. "It is further ordered," wrote the District Court, that the United States is entitled to "seize and remove to impound" any Bundy cattle found trespassing on the range in the future.

## III.   LAW AND ARGUMENT

**Rule 60(b)** of the Federal Rules of Civil Procedure provides that "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for [certain specific] reasons," including where the judgment is void

(Subsection (b)(4)), where "the judgment has been satisfied, released, or discharged, . . . or applying it prospectively is no longer equitable" (Subsection (b)(5), or where "any other reason justifies relief" (Subsection (b)(6).

In this case, all three subsections described above (60(b)(4), 60(b)(5) and 60(b)(6), apply to this matter and should be given deference.

## I.      ARGUMENT

### a. The 531 Order is Void Pursuant to Rule 60(b)(4), for vagueness and otherwise.

First, the October 8, 2013 order is void on its face, as a reasonable officer executing it cannot determine its precise scope or limitations.  Rule 65(d) of the Federal Rules of Civil Procedure requires the language of injunctions to be reasonably clear so that ordinary persons will know precisely what action is proscribed or required.  See *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985).  Because of the strong policy of clarity behind rule 65(d), all ambiguities are resolved in favor of the person subject to the injunction. *Id.*

The order in question, authorizing "the United States" to "seize and remove to impound" cattle was used to justify not only the impoundment of cattle (with an apparent intent by United States to convert the cattle to government ownership) but the wholesale destruction of hundreds of thousands of dollars of range improvements, without compensation as required by federal law.[5]  Executing officers used the order as an excuse to close off tens of thousands of acres to the public, to erect 'first amendment zones,' and to convert Bundy cattle (and/or the cattle of others) to the ownership of the United States.

---

[5] See, among other things, the Federal Land Policy Management Act at 43 U.S.C. § 402, which requires compensation for range improvements to a grazing-right owner whenever an allotment or permit is closed or canceled.  See also the 5th amendment, which states that property shall not be taken without just compensation.

The plain language of the order (on page 5) states that "the United States is entitled to seize and remove to impound any of Bundy's cattle that remain after 45 days . . ." Nothing in the phrase "seize and remove to impound" suggests any authorization to transfer title or ownership in the cattle to the United States. (Indeed, the very term impound means to safely keep another's property in the person's behalf.) Yet in March and April of 2014, officers of the United States purported to 'execute' the stale and unenforceable order by converting Bundy cattle and claiming them as the United States' own and preparing to ship them outside the state for sale.

Nothing in the order authorized shipment out of state. Nothing in the order authorized the United States to claim ownership in the cattle. Nothing in the order authorized the killing of any cattle. The order merely authorized seizure and impoundment.

Although a judgment is not void merely because it is erroneous, it is void where its parameters are vague or indecipherable or where it is based on misinterpretation of the law or issued outside lawful authority. *Holtzman* at 724. In this case, the order is so fundamentally boundless that its executing agents could not determine whether it had any limitations. Therefore, this motion is necessary to vacate, set aside or modify the order.

And, of course, a motion to vacate or set aside a judgment is never time-barred where a judgment is void. See *Meadows v. Dominican Republic*, 817 F.2d 517, 521 (9th Cir. 1987) ("There is no time limit on a Rule 60(b)(4) motion to set aside a judgment as void"); See *Sea-Land Serv., Inc. v. Ceramica Europa II, Inc.*, 160 F.3d 849, 852 (1st Cir. 1998) (if judgment is void for lack of personal jurisdiction, Fed. R. Civ. P. 60(b)(4) motion to set aside judgment may be made at any time); *Carter v. Fenner*, 136 F.3d 1000, 1006 (5th Cir. 1998) (there is no time limit on attack on judgment that is void).

### b. The 531 Order is Satisfied Pursuant to Rule 60(b)(5).

The attempted execution of the Court's October 2013 order was peculiar and abnormal in a number of ways. The Department of Interior, Bureau of Land Management (BLM) has been the complainant throughout this case. The BLM is required by law to recognize local easements, longstanding ditches and water improvements and range improvements, and to compensate ranchers for destruction of property or for takings of improvements. Yet in this case, the BLM—the complainant—was enlisted to carry out the court order it had obtained. The Court should have appointed a receiver or a special master, and ordered a return, or a money accounting upon the execution of its order. Another, more neutral, agency or entity such as the U.S. Marshals Service should have executed the orders.

The placement of the antagonistic BLM in a position to execute the orders it had obtained led to a fundamental conflict of interest. The BLM is openly hostile to Cliven Bundy and used the District Court's orders to unleash wanton destruction and otherwise abuse Bundy and his family. Attached to this filing as the Defendant's Exhibit "A" is an affidavit of Dr. Angus McIntosh, an appraiser of property rights and values on public lands, who estimates that the BLM caused at least $400,000 of damage (measured by costs required for full replacement) to Bundy water improvements, corrals and other improvements (in just one canyon area). This dollar amount more than offsets the fines and claims for compensation present in this case.

Moreover, nothing in the Court's order authorized such wholesale destruction of range and water improvements, nor to desecrate graves.

Further, the Court's order is essentially unlimited in its prospective breadth, as it purports to allow the government to "seize and remove to impound" any Bundy cattle found trespassing in the future indefinitely. Such a limitless scope is beyond the proper

jurisdiction of any court, and cries out for modification or relief under Rule 60(b)(5) (allowing an order to be set aside when "applying it prospectively is no longer equitable.")

### c. The 531 Order is Barred by Equitable Estoppel Pursuant to Rule 60(b)(5)

The government is estopped from enforcing the order because, for more than a decade after the 1999 order, the government allowed Bundy to make hundreds of thousands of dollars of improvements on the land. During this case's decade of dormancy, Cliven Bundy and his family built important water and range improvements, which BLM agents acquiesced to have placed on the property. Consequently, Bundy relied to his detriment on the government's actions and inactions, and acted with the good faith understanding that the government recognized Bundy's grazing rights.

Many kinds of activities— or inactivity— on the part of a party may permit the defense of equitable estoppel to be asserted against him. A party's silence, for example, will work an estoppel if, under the circumstances, he has a duty to speak. A common example of this occurs when a plaintiff knowingly permits a defendant to make expenditures or improvements on property the latter believes to be his, but which in fact the plaintiff knows to be the plaintiff's property. See *United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir. 1970). No case in history illustrates such equitable estoppel as much as in this case.

### d. The Government is estopped from enforcing the order because it concealed the availability of free grazing from Bundy.

Throughout this litigation, the Government has represented to Cliven Bundy—and to the courts—that all cattle ranchers on public ranges must pay annual fees to the federal government. Yet federal law provides that ranchers (such as Bundy) whose base property and residence adjoin public ranges and who need such ranges to support their domestic

livestock are entitled to graze such livestock for free.  Specifically, the Taylor Grazing Act, 43 U.S.C. §315(d) provides that:

> **The Secretary of the Interior shall permit, under regulations to be prescribed by him, the free grazing within such districts of livestock kept for domestic purposes.**

43 C.F.R. §4130.5 provides further details:

> **A free-use grazing permit <u>shall be issued</u> to any applicant whose residence is adjacent to public lands within grazing districts and who needs these public lands to support those domestic livestock owned by the applicant.**

Id. (emphasis added).

Thus, even as the United States was suing and representing to courts that Bundy must pay the federal government for grazing, its agents were well aware that Bundy qualified for free grazing of livestock in the district, under federal statutes.

The Ninth Circuit's decision in *United States v. Wharton*, 514 F.2d 406 (1975) is directly on point.  Where a descendant of a person who had originally settled on public land approached government officials to determine what his family could do to gain title to land and those government officials misrepresented that there was no way to gain title (at a time when it was still possible to gain title by filing a new desert-entry application), estoppel would be applied against the United States.  This was true even though the rancher acted in bad faith or otherwise imperfectly.  *Id.*

Under the rule of *Wharton*, the United States had a duty to inform Cliven Bundy of the availability of 315(d) free grazing permits—and to issue such a permit to Bundy.  Instead, the government acted in bad faith to deceive Bundy (and this Court) with claims that

Bundy's grazing on the Bunkerville ranges constituted a near-catastrophic, apocalyptic affront to federal law.

### e.  Extraordinary Circumstances Demand Setting Aside/Vacating the Order Pursuant to Rule 60(b)(6).  The Order is Unenforceable.

In March and April 2014, the Bureau of Land Management sought to execute the stale and unenforceable order in this case using hundreds of heavily-armed federal agents, helicopters, sniper teams, undercover informants, video and internet surveillance, land closures and first amendment zones. Agents cruised over the landscape in convoys, shouting at the American people and threatening them.  The resulting outrage among the community caused extreme damage to the social and physical landscape.  These harms continue to reverberate throughout the community.

Nevertheless, despite spending tens of millions of dollars, the combined forces of the BLM, National Park Service, Park Police, FBI and U.S. Attorney's Office were unable to successfully carry out the order(s).  More than a dozen men remain incarcerated while their families live in poverty.

The United States had its opportunity to execute the Court's orders in April 2014. Notwithstanding, it failed despite massive expenditures and efforts made.  Whereas, it does not appear that the United States, through the various agencies, has the ability to successfully execute the stale and unenforceable order, and that it should be determined that a successful execution is an impossibility and that an impossibility exists with regard to the same.

At some point, the State of Nevada and its citizens cannot be unilaterally and prejudicially controlled and regulated by the United States government through its various agencies.  Consider that by now, Bundy cattle have been a natural component of the rangelands around the Bunkerville area for generations upon generations throughout years

and years.  Cattle graze in harmony with other livestock and wildlife, and have long been a part of Nevada's outdoor and recreational landscape, which is true of the Bundy's cattle. Moreover, Bundy's range and water improvements have greatly increased the health and vitality of the region's wildlife and flora where the cattle graze and roam.

Whereas, it should be determined that the District Court's order(s) in this case are almost certainly unenforceable, and even if they were enforceable, it would not occur without the exacting of an extreme expenditure of government resources on Bundy and the good people of the State of Nevada.  There are already untold thousands of critics and opponents of the BLM's heavy-handed tactics that were used prior, who have soured on government aggression on its citizens.

**WHEREFORE,** the Defendant, Cliven D. Bundy, respectfully requests that this Court grant the relief requested herein and **SET ASIDE and VACATE** the 2013 Injunctive Relief Order (ECF No. 56); **GRANT** Bundy's Motion for an evidentiary hearing; and grant any other and further relief this Court deems proper and just.

*(An affidavit is attached to this Motion and is incorporated herein.)*

Respectfully submitted by,

**KURTH LAW OFFICE**

/s/ Roger I. Roots*
ROGER I. ROOTS, ESQ.
Attorney at Law
Pro Hac Vice Counsel (application pending)
Rhode Island Bar No. 6752
113 Lake Drive East
Livingston, MT  59047
Tel: (406) 224-3105
Email: rogerroots@msn.com
Attorney for Defendant, Cliven D. Bundy

/s/ Robert O. Kurth, Jr.
ROBERT O. KURTH, JR.
Nevada Bar No. 4659
3420 North Buffalo Drive
Las Vegas, NV  89129
Tel: 702-438-5810
Fax: 702-459-1585
Email: kurthlawoffice@gmail.com
NV Resident Attorney for Defendant, Cliven D. Bundy

*Pro hac vice application pending.*

1
2
3 **CERTIFICATE OF SERVICE**

4      I, Robert O. Kurth, Jr., an employee of the Kurth Law Office, does hereby certify that
5 a true and correct copy of the above and foregoing Motion was served upon counsel of
6 record, via electronic service via the CM/ECF system, on the 14th day of November, 2017.

7
8                              /s/ Robert O. Kurth, Jr.
9                             An employee of the **KURTH LAW OFFICE**.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28                              **EXHIBIT "A"**

DECLARATION OF ANGUS MCINTOSH, PH.D.

My name is Dr. Angus McIntosh and I reside in Craig, Colorado. I am of adult age and state the following facts under my oath and under penalties of perjury. These facts are all within my personal knowledge.

1. I am Executive Director of the Range Allotment Owners Association. RAO represents the interests and supports the property rights of 22,000 allotment owners in the 17 contiguous Western States. Our website is rangeallotmentowners.com
2. I was Adjunct Professor of Agriculture at Texas A&M teaching online courses for 2015 - 2016.
3. As a consultant I have taken over 150 hours of Appraisal courses and was an Apprentice Appraiser for several years in New Mexico. My Doctoral Dissertation was "Property Rights On Western Ranches: Federal Rangeland Policy And A Model For Valuation."
4. I have given Expert Testimony/Expert Reports in the Federal Courts of AZ, CO, NV, OR, the US Court of Federal Claims, and the IBLA. I've also given Testimony on Water and Rangeland Property Rights before the Legislatures in AZ, NM, NV & MT. I've provided research for and assisted in writing reports on Western land issues for the US House of Representatives Committees (for the US Congresswoman Helen Chenoweth-Hage).
5. On January 7, 2017 I visited the Bundy Ranch outside Bunkerville, Nevada to try to evaluate losses in property values attributable to destruction of range and water right improvements by federal Bureau of Land Management personnel in April 2014.
6. The BLM personnel had used heavy equipment in April 2014 to tear up range and water improvements operated and maintained by the Cliven Bundy Ranch. I witnessed evidence of this destruction firsthand, and saw that black plastic water pipes had been haphazardly pulled up out of the ground by government backhoes. Pieces and shards of water lines had been left to lay on top of the ground.
7. In the intervening 3-year period since 2014, Cliven Bundy and his family had made efforts to temporarily work around the BLM destruction by directing water through the canyon via a temporary PVC pipe which in places lay on top of the sand.
8. Further up the canyon I saw that Bundy had greatly improved the range in the past. Bundy had improved water capture with well-engineered filtering mechanisms to capture water for livestock and wildlife. Based on my knowledge and experience, it is likely that numbers and quality of wildlife and ecosystems had improved because of Bundy's improvements.
9. Based on my knowledge and expertise regarding range and water improvements, I conservatively estimate that the improvements had cost the Bundy Ranch at least $100,000 in parts and materials. Based on my knowledge and experience, the labor costs required to properly install this equipment would likely have a value of at least three (3) times the value of the materials. Thus, the destruction of the water improvements I witnessed must have caused at least $400,000.00 of damage.
10. Mind you, the destruction of the water improvements I witnessed was only a small part of the total destruction caused by the BLM in 2014. I am aware of other improvements to water delivery in other valleys on the Bundy Ranch operations which I did not personally witness. An evidentiary hearing is needed for further factfinding regarding that greater destruction.
11. I estimate that the water improvements in the canyon corridor I witnessed must have improved the longterm value of the operation by substantially more than $1 million. The destruction of those water systems must therefore have caused that much harm to the ranch operation.

Further I sayeth not,

Angus McIntosh

*Angus McIntosh*

Dated Oct 25, 2017

*Subscribed and sworn or affirmed to before me in the county of Kit Carson, State of Colorado, this 25th day of October, 2017.*

*Kathy Killian*

KATHY KILLIAN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20114045932
COMMISSION EXPIRES SEP. 21, 2019

*My Commission expires September 21, 2019*